MANUEL ROSE *vs.* SOCONY–VACUUM CORP.

JOSEPH ROCHA *vs.* SAME.

JULY 2, 1934.

PRESENT: Stearns, C. J., Rathbun, Sweeney, Murdock, and Hahn, JJ.

MURDOCK, J. These cases, described in the writs as trespass on the case for causing a nuisance, were heard together for the reason that the same questions of law are involved in each case. They are here on plaintiffs' exceptions to a ruling of the Superior Court sustaining demurrers to the declarations which are summarized in plaintiffs' brief as follows: "The plaintiff (Manuel Rose) for thirty years prior to and in June, 1930, owned a farm in East Providence, bounding southerly on the state highway known as the Wampanoag Trail, comprising fifty-seven acres with a dwelling house, large barn and other out buildings thereon, and occupied by him and his family. On the farm was a well of pure water used for drinking purposes, and on the westerly part of the farm was a stream in part fed by percolations of water in and under the land of the defendant and said highway and into said stream. On the farm was a large piggery and a hennery, the hens supplied by water from the well, and the pigs supplied by water of the stream. On the southerly side of and bounding northerly on said highway and opposite said farm the defendant had a large tract of land at a higher elevation than the farm.

"Years before 1930, the defendant acquired said tract of land and built upon it a large oil refinery and a large number of tanks for storing petroleum, gasoline and other petroleum products, and operated the same and from time to time suffered and permitted to be discharged on its land and into settling basins, bodies of water and natural water ponds and ways thereon, large quantities of petroleum, gasoline,

petroleum products and waste substances from its refinery and tanks with the result that large parts of its said land, basins, bodies of water and natural water ponds and ways became impregnated, and polluted by the same, and that it was the duty of the defendant to confine to its said land said polluting matters and substances and said waters in their polluted condition and not suffer or permit the same to be discharged or escape from its land to, in, under and on any adjoining or neighboring land, and thereby create a nuisance thereon to its injury, but the defendant disregarding its duty wrongfully and injuriously suffered and permitted large quantities of said polluting matters and substances and said waters in their polluted condition to escape from time to time from its land by means of percolations thereof in, under and through its land to, in, under and through said highway and to, in, under, on and through said farm and parts thereof and to and into said well and said stream, with the direct result that in said June, 1930, said well became polluted by the same and especially by gasoline and rendered unfit as drinking water for use by man or beast, and also said stream theretofore fit for use then became polluted and unfit for use by man or beast with the direct result that the plaintiff in June, 1930, and until the present time was deprived of the use of said well and stream and obliged since to obtain water from other sources off his farm for the supply of his house for drinking and domestic uses and watering his hens and for watering his hogs and pigs and other uses for which the stream was available.

"Further the declaration sets forth that because of the pollution of the stream 136 of his hogs and pigs died from drinking the waters, including 75 breeding sows, and because of the pollution of the well about 700 of his hens died from drinking the well waters, and that because of a lack of a wholesome water supply the plaintiff has been deprived of raising on his farm as large a number of pigs and hens as theretofore and his business in raising and selling the same

interfered with and greatly reduced in amount to his monetary damage and loss. The declaration concludes with a general allegation as to other damages from said nuisance caused by the defendant."

The declarations allege no negligent act and recovery is sought principally on the ground that the acts set forth in the declarations have resulted in a nuisance for which defendant is liable even though not negligent. The assertion that the acts of the defendant complained of have resulted in a nuisance is *petitio principii*.

There is no wholly satisfactory definition of what constitutes a nuisance but it is generally agreed that a nuisance has its origin in the invasion of a legal right. In Cooley on Torts, Vol. 3 (4th ed.) § 398, it is said that: "An actionable nuisance may, therefore, be said to be anything wrongfully done or permitted which injures or annoys another in the enjoyment of his legal rights" and in Joyce on Nuisances, § 29, that "a nuisance does not necessarily exist even though one may by the use of his property cause an injury or damage to another." The plaintiffs must therefore go further to establish liability than the mere assertion that a nuisance exists on their land by reason of the acts of the defendant.

The plaintiffs' cases rest on the proposition that they have a cause of action from the fact that contaminating and deleterious substances have escaped from the land of the defendant through the medium of percolating waters to their land. The plaintiffs rely on the much-discussed case of *Rylands* v. *Fletcher*, L. R. 3 H. L. 330, where the following rule laid down by Mr. Justice Blackburn in *Fletcher* v. *Rylands*, L. R. 1 Ex. 265, was approved. "We think that the true rule of law is, that the person who, for his own purposes, brings on his land and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape. He can excuse himself by showing that the

escape was owing to the plaintiff's default; or, perhaps that it was the consequence of *vis major*, or the act of God; but as nothing of this sort exists here, it is unnecessary to inquire what excuse would be sufficient. The general rule, as above stated, seems on principle just . . . and it seems but reasonable and just that the neighbour who has brought something on his own property (which was not naturally there), harmless to others so long as it is confined to his own property, but which he knows will be mischievous if it gets on his neighbour's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property." This rule is a radical departure from the commonly accepted doctrine of the law of torts that liability is predicated on fault. It has not found general acceptance in this country and in England it has been greatly modified by later decisions. *Wilson* v. *Newberry*, L. R. 7 Q. B. 31; *Ross* v. *Feddon*, L. R. 7 Q. B. 661; *Nichols* v. *Marsland*, L. R. 2 Ex. D. 1; *Box* v. *Jubb*, 4 Ex. D. 76. See Pollock, Law of Torts, (12th ed.) p. 496; Salmond, Law of Torts, (7th ed.) p. 23; Law Times Rep. Vol. 140, p. 1.

A profound criticism of the rule is found in the opinion of Mr. Justice Doe in *Brown* v. *Collins*, 53 N. H. 442 at 448, where it is said: "Everything that a man can bring on his land is capable of escaping,—against his will, and without his fault, with or without assistance, in some form, solid, liquid, or gaseous, changed or unchanged by the transforming processes of nature or art,—and of doing damage after its escape. Moreover, if there is a legal principle that makes a man liable for the natural consequences of the escape of things which he brings on his land, the application of such a principle cannot be limited to those things: it must be applied to all his acts that disturb the original order of creation; or, at least, to all things which he undertakes to possess or control anywhere, and which were not used and enjoyed in what is called the natural or primitive condition of mankind, whatever that may have been. This is going

back a long way for a standard of legal rights, and adopting an arbitrary test of responsibility that confounds all degrees of danger, pays no heed to the essential elements of actual fault, puts a clog upon natural and reasonably necessary uses of matter, and tends to embarrass and obstruct much of the work which it seems to be man's duty carefully to do." *Losee* v. *Buchanan*, 51 N. Y. 476; Burdick, Law of Torts, (4th ed.) § 12: "The rule in *Rylands* v. *Fletcher*, even with its recognized limitations, finds no great favor even in England, and American courts have generally refused to follow it." See also Bohlen, Studies in the Law of Torts, p. 421.

We think therefore that reason and the great weight of authority in this country sustain us in refusing to adopt the rule of absolute liability as stated in *Rylands* v. *Fletcher, supra*.

The plaintiffs lean heavily on the maxim *sic utere tuo ut alienum non laedas*. This maxim, so often cited as the governing principle of decisions, affords little, if any, aid in the determination of the rights of parties in litigation. If it be taken to mean any injury to another by the use of one's own, it is not true and if it means legal injury, it is simply a restatement of what has already been determined. "The maxim, *sic utere tuo ut alienum non laedas*, is mere verbiage. A party may damage the property of another where the law permits; and he may not where the law prohibits: so that the maxim can never be applied till the law is ascertained; and, when it is, the maxim is superfluous." ERLE, J., in *Bonomi* v. *Backhouse*, El. Bl. & El. 622, p. 643. 2 Austin, Jur., (3rd.) 795, 829. The maxim is undoubtedly a sound moral precept expressing an ideal never fully attained in the social state.

We must therefore look for some fault on the part of the defendant. It is well settled law that one who accumulates filth or other deleterious matter on his land must confine it there and not allow it to spread over the surface of his land to the surface of the land of another. Where one has filth deposited on his premises, "he whose dirt it is must keep

it that it may not trespass." *Tenant* v. *Goldwin*, 1 Salk 360. And this rule will apply where the objectional matter permeates the soil superficially and by the action of the elements reaches the soil of another. Liability in this class of cases sounds in trespass.

The owner of land bounding on a surface stream may not pollute the same to the impairment of the use and enjoyment of the stream by other riparian owners; and this rule applies to subterranean streams following a known or readily ascertainable and well-defined course. 27 R. C. L. p. 1170. Liability for the pollution of a surface stream or subterranean stream following a well-defined course is predicated on the invasion of a correlative right of the injured party in such waters. This leads to an inquiry into the nature and extent of the right of a landowner in the waters beneath the soil which pass from his land, not in a well-defined stream but by percolation or seepage.

The leading case on this question is *Acton* v. *Blundell*, 12 Mees. & Wels. Rep. 324, decided in 1843. In that case it was held that the right to the waters in the soil was not governed by the rule applicable to surface streams. The court at page 351 said: "But the difference between the two cases with respect to the consequences, if the same law is to be applied to both, is still more apparent. In the case of the running stream, the owner of the soil merely transmits the water over its surface: he receives as much from his higher neighbour as he sends down to his neighbour below: he is neither better nor worse: the level of the water remains the same . . . and we think the present case, for the reasons above given, is not to be governed by the law which applies to rivers and flowing streams, but that it rather falls within that principle, which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil, part water; that the person who owns the surface may dig therein, and apply all that is there found to his own pur-

poses at his free will and pleasure; and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbour's well, this inconvenience to his neighbour falls within the description of *damnum absque injuria,* which cannot become the ground of an action."

In England this right to underground waters has been held to be absolute and the motive of the owner in appropriating or diverting the same is immaterial. *Mayor of Bradford* v. *Pickles,* (1895) App. Cas. 587. In this country the authorities are in conflict as to the nature of the right in underground waters. Some jurisdictions follow the English rule and others modify the rule to the extent that the owner of land may not through malice or negligence deprive the adjoining owner of percolating waters. To this extent in the latter jurisdictions the right is not absolute but relative. See *Chatfield* v. *Wilson,* 28 Vt. 49; *Elster* v. *Springfield,* 30 N. E. Rep. 274; *Phelps* v. *Nowlen,* 72 N. Y. 39; *Chesley* v. *King,* 74 Me. 164; *Greenleaf* v. *Francis,* 18 Pick. 117; *Wheatley* v. *Baugh,* 25 Pa. St. 528; *Bassett* v. *Company,* 43 N. H. 569; *Roath* v. *Driscoll,* 20 Conn. 533. Angell on Watercourses, (6th ed.) 114.

In this State the right to subterranean waters appears to be relative to the extent that they may not be purposely or negligently diverted. In *Buffum* v. *Harris,* 5 R. I. 243, it was held on motion for a new trial, after a verdict for the defendant, that the plaintiff received the benefit of all the direction to which he was entitled when the jury were charged: "That if the defendant had purposely or negligently constructed his drains, so as thereby to drain the water off from, or to lessen the quantity of water in the plaintiff's fountain, he would be liable to the plaintiff therefor."

While the defendant could appropriate to its own use the percolating waters under its soil—providing that in so doing it was not actuated by an improper motive and was not negligent—can it, by the use to which it puts its land, deprive the plaintiffs of such waters by rendering them

unfit for plaintiffs' use by contamination? Authorities, few in number, which bear directly on this question, are in conflict. In *Brown & Bros.* v. *Illius,* 27 Conn. 84, the plaintiffs complained that a well on their premises was polluted by refuse from the manufacture of gas dumped on the ground of the defendant. It was held that, if the noxious substances reached plaintiffs' well by percolating subterranean waters, the defendant was not liable.

*Dillon* v. *Acme Oil Co.,* 49 Hun. 565, is strikingly similar in many particulars to the instant case. In that case the plaintiff owned land on which there were two wells; twenty rods away and separated therefrom by a public street and a railroad with several tracks, defendant conducted an oil refinery. Plaintiff's wells were polluted by oil from this refinery which had percolated through the earth and was carried by some subterranean stream to plaintiff's wells. It was held that the law controlling the rights of the parties to surface streams had no application to subterranean waters running through unknown channels and that, "in the absence of negligence or knowledge as to the existence of such subterranean watercourses, when the business is legitimate and conducted with care and skill, there can be no liability if such subterranean courses become contaminated."

In *Upjohn* v. *Richland Township,* 46 Mich. 542, relief, by way of injunction to restrain the board of health in said township from extending its cemetery so as to bring it closer to complainant's premises, was denied. The opinion in this case is of particular interest for the reason that it was written by that distinguished commentator on the law, Mr. Justice Cooley. While relief appears to have been denied in part on other grounds, the opinion discusses at length the law pertaining to percolating waters. After stating the distinction between surface streams and percolating waters, the opinion proceeds: "but, if withdrawing the water from one's well by an excavation on adjoining land will give no right of action, it is difficult to understand how

corrupting its waters by a proper use of the adjoining premises can be actionable, when there was no actual intent to injure, and no negligence. The one act destroys the well and the other does no more; the injury is the same in kind and degree in the two cases." The rationale of these opinions is that the courses of subterranean waters are as a rule indefinite and obscure and, therefore, the rights relating to them can not well be defined as in the case of surface streams. To give to others a right in such waters may subject a landowner to liability for consequences, arising from a legitimate use of his land, which he did not intend and which he could not foresee. *Contra* are *Kinnaird* v. *Standard Oil Co.*, 89 Ky. 468; *Beatrice Gas Co.* v. *Thomas*, 41 Neb. 662; *Berger* v. *Minneapolis Gaslight Co.*, 60 Minn. 296; *Gilmore* v. *Royal Salt Co.*, 84 Kan. 729; *Masten* v. *Texas Co.*, 194 N. C. 540.

*Kinnaird* v. *Standard Oil Co.*, *supra*, supports plaintiffs' view of the law. The opinion discusses the above cases holding to the contrary and refuses to follow them; it recognizes the right of the landowner to appropriate to his own use the percolating waters under his soil but holds him liable if he contaminates them. This case as an authority in support of plaintiffs' position is weakened by the opinion in *Long* v. *Louisville & Nashville R. R. Co.*, 128 Ky. 26, which holds that the basis of liability for the contamination of a spring, through the pollution of percolating waters, is negligence.

*Beatrice Gas Co.* v. *Thomas, supra* and *Gilmore* v. *Salt Co., supra,* follow the reasoning in *Kinnaird* v. *Standard Oil Co., supra.* The report of the case of *Martin* v. *Texas Co., supra,* does not disclose whether negligence was alleged. The opinion, however, seems to indicate that an allegation of negligence was not necessary. The case of *Berger* v. *Minneapolis Gaslight Co., supra,* appears to rest on the doctrine of *Fletcher* v. *Rylands, supra.*

A query arises as to whether the divergence of views expressed in these cases is not due to the influence of the

predominating economic interests of the jurisdictions to which these apply; in other words, whether these opinions do not rest on public policy rather than legal theory. On the question of public policy as a ground of judicial decision, see an article by Mr. Justice HOLMES in 8 Harvard Law Review, 1.

It will be observed that in jurisdictions, holding that even though there is no negligence there is liability for the pollution of subterranean waters, the predominating economic interest is agricultural.

Defendant's refinery is located at the head of Narragansett Bay, a natural waterway for commerce. This plant is situated in the heart of a region highly developed industrially. Here it prepares for use and distributes a product which has become one of the prime necessities of modern life. It is an unavoidable incident of the growth of population and its segregation in restricted areas that individual rights recognized in a sparsely settled State have to be surrendered for the benefit of the community as it develops and expands. If, in the process of refining petroleum, injury is occasioned to those in the vicinity, not through negligence or lack of skill or the invasion of a recognized legal right, but by the contamination of percolating waters whose courses are not known, we think that public policy justifies a determination that such injury is *damnum absque injuria*.

The plaintiff's exceptions in each case are overruled and each case is remitted to the Superior Court for further proceedings.

*William A. Needham, Albert A. Baker, Baker & Spicer*, for plaintiff.

*Francis I. McCanna*, for defendant.