W. Edward WOOD et al.

v.

Warren V. PICILLO et al.

No. 80–419–Appeal.

Supreme Court of Rhode Island.

April 9, 1982.

Reargument Denied April 29, 1982.

license are not required to take the examination. *See* G.L. 1956 (1976 Reenactment) § 5–20.5–4, as amended by P.L. 1981, ch. 249, § 1.

Dennis J. Roberts, II, Atty. Gen., Daniel J. Schatz, Sp. Asst. Atty. Gen., for plaintiffs.

Charles J. Rogers, Jr., Providence, for defendants.

## OPINION

WEISBERGER, Justice.

This is an appeal from a judgment of the Superior Court entered after trial without the intervention of a jury. Finding that the defendants created a public and private nuisance in maintaining a hazardous waste dump site on their Coventry farm, the trial justice enjoined further chemical disposal operations at the defendants' property and ordered the defendants to finance cleanup and removal of the toxic wastes. The defendants now contend that the trial justice erred in finding the disposal operation to be a public and private nuisance. We strongly disagree. Accordingly, the judgment of the Superior Court is affirmed.[1]

The testimony elicited during the extensive hearings conducted on this case revealed the following dramatic events. On September 30, 1977, an enormous explosion erupted into fifty-foot flames in a trench on defendants' Coventry property. Firefighters responded to the blaze but could not extinguish the flames. As the fire raged within the trench, additional explosions resounded. From the conflagration billowed clouds of thick black smoke that extended "as far as the eye could see on the Eastern horizon."

Not unexpectedly, the extraordinary blaze aroused the interest of various state officials. The state fire marshal declared the dump site a fire hazard and ordered defendants to cease disposal activity and to remove all flammable wastes. Personnel from the Department of Environmental Management (DEM) also investigated the dumping operation, conducting soil, water, chemical, and topographical analyses of defendants' property and adjacent areas. Despite the fire marshal's order and the ongoing official investigations, the dumping and burying of chemical wastes continued.

A general description of the Picillo property and adjacent lands is helpful in evaluating the evidence. According to the testimony of various witnesses, the Picillos owned acreage on Piggy Hill Lane in Coventry, Rhode Island. Piggy Hill Lane, which serves only the Picillos' property, is a winding dirt road running from Perry Hill Road. Near the entrance of the property defendants maintain pigs, and two houses are also located in this general area. A three to five-acre clearing in once-wooded

---

1. Although there are multiple parties to this action and all claims have not yet been resolved, the trial justice determined that there was no just reason for delay of entry of judgment against the present defendants. Certification pursuant to Super.R.Civ.P. 54(b) was entered *nunc pro tunc* on January 14, 1982.

land lies approximately 800 feet uphill from the two homes. It is this clearing that houses the chemical dump site. About 600 feet downhill to the north-northwest of the clearing is a marshy wetland. The wetland is part of the Quinabog River Basin; the wetland waters drain in a gradual south-westerly flow into the Quinabog River, Wickford Pond, the Roaring Brook, and Arnold Pond. These fish-inhabited waters are utilized both by the general public and by a commercial cranberry grower.

The dump site proper might best be described in the succinct expression of the trial justice as "a chemical nightmare." John Quinn, Jr., chief of the DEM's solid-waste management program, visited defendants' property on October 13, 1977 and testified to what he saw. Quinn stated that at one side of the clearing lay a huge trench which he estimated to be 200 feet long, 15 to 30 feet wide, and 15 to 20 feet deep. A viscous layer of pungent, varicolored liquid covered the trench bottom to a depth of six inches at its shallowest point. Along the periphery of the pit lay more than 100 fifty-five gallon drum-type and five-gallon pail-type containers. Some of the containers were upright and sealed, some tipped, and some partially buried; some were full, some partially full, and some empty. An official from the state fire marshal's office also visited the dump site. He testified that on October 15, 1977, he observed a truck marked "Combustible" offloading barrels of chemical wastes. The truck operator knocked the barrels off the truck's tailgate directly onto the earth below, and chemicals poured freely from the damaged barrels into the trench. In 1979 state officials discovered a second dump site when "sink holes" emitting chemical odors opened in the earth at some distance from the previously described pit.

Several witnesses testified at trial to the immediate and future effects of the chemical presence. Neighbors of the Picillos reported that in the year preceding the fire, tractor-trailer traffic to and from defendants' property greatly increased. According to the testimony many of the trucks bore "Flammable" warnings and the name of a chemical company. The neighbors also testified that on several occasions during the summer of 1977 pungent odors forced them to remain inside their homes. The odors were described variously as "sickening," "heavy," "sweet," "musky," "terrible," and like "plastic burning." One neighbor testified that the odors induced in her severe nausea and headaches, while another stated that on one occasion fumes from the Picillo property caused her to cough severely and to suffer a sore throat that lasted several days.

At trial expert witnesses developed a scientific connection between the neighbors' experiences and the Picillos' operations. Laboratory analyses of samples taken from the trench, monitoring wells, and adjacent waters revealed the presence of five chemicals: toluene, xylene, chloroform, III trichloroethane, and trichloroethylene.[2] Doctor Nelson Fausto, a professor of medical sciences in the pathology division of the Department of Biological and Medical Sciences at Brown University, described the toxic effects of the five discovered chemicals. Doctor Fausto testified that chloroform is a narcotic and an anesthetic that will induce vomiting, dizziness, and headaches in some persons exposed to it. Trichloroethane and trichloroethylene, according to Dr. Fausto, are similar to chloroform in chemical structure and in toxic effect. Toluene and xylene are also toxins, Dr. Fausto testified, that may cause irritation of the mucous membranes in the upper respiratory tract.

Doctor Fausto explained that the chemicals in question also exert chronic or long-term effects on animals and humans. According to the professor, chloroform, trichloroethane, and trichloroethylene are strong carcinogens that cause cirrhosis (cell death) of the liver and hepatoma (cancer of the liver). Doctor Fausto asserted that there is no safe level of human or animal exposure to these chemicals. Regarding toluene and xylene, Dr. Fausto testified

2. These were the only chemicals for which tests were conducted.

that neither is as yet known to be carcinogenic, but both exert a toxic effect on bone marrow, causing anemia in susceptible persons. Additionally, Dr. Fausto stated, the presence of chloroform in areas where it might be heated presents further potential danger. Heated to sixty-eight degrees Fahrenheit, chloroform converts to phosgene gas, a nerve gas of the type utilized in World War I. Doctor Fausto stated that direct sunlight would provide sufficient heat to turn chloroform present in surface water into phosgene.

According to the experts, the chemicals present on defendants' property and in the marsh, left unchecked, would eventually threaten wildlife and humans well downstream from the dump site. Mr. Frank Stevenson, the principal sanitary engineer for the DEM, and Dr. William Kelly, an Associate Professor of civil and environmental engineering at the University of Rhode Island, testified as experts in soil mechanics and groundwater hydrology. The experts established that the soil at the dump site consisted of an unstratified composition of sand, gravel, and silt of varying sizes. The permeable nature of this soil would allow any liquid or chemical in or on it to percolate down to the water table and to travel with the groundwater in a northerly flow. The opinion of the experts was buttressed by the documented presence of toluene, xylene, chloroform, trichloroethane, and trichloroethylene in the northern marsh and in several monitoring wells.[3] The only possible source of the pollutants, according to Dr. Kelly, was the Picillo dump site.

Expert testimony further revealed that the chemicals had traveled and would continue to travel from the dump site into the marsh at the rate of about one foot per day. From the marsh, predicted the experts, the chemicals would flow in a southwesterly direction into the Quinabog River and its tributaries Moosup River and Roaring Brook, and Wickford Pond. These waters are inhabited by fish and used by humans for recreational and agricultural purposes.

On these and other facts the trial justice determined the dump site to be a public and private nuisance. He found also that the current danger to the public health and safety posed by the chemical presence would worsen unless effective remedial action was quickly taken. The trial judge thus permanently enjoined disposal operations on defendants' property and ordered that all chemicals and contaminated earth be removed to a licensed disposal facility. Because defendants had in the past displayed an unwillingness or inability to remedy the danger, the Superior Court justice authorized plaintiffs to effectuate cleanup of defendants' property at defendants' expense.

■ The defendants contend that the evidence adduced at trial was insufficient to support a finding of public and private nuisance. The defendants point to two alleged evidentiary inadequacies: (1) that plaintiffs failed to establish any significant injury to persons or to natural wildlife and (2) that plaintiffs failed to meet their obligation to show that defendants acted negligently in disposing chemical wastes on their property. We find both assertions to be without merit.

■ The essential element of an actionable nuisance is that persons have suffered harm or are threatened with injuries that they ought not have to bear. *Citizens for Preservation of Waterman Lake v. Davis*, R.I., 420 A.2d 53, 59 (1980). Distinguished from negligence liability, liability in nuisance is predicated upon unreasonable injury rather than upon unreasonable conduct. *Braun v. Iannotti*, 54 R.I. 469, 471, 175 A. 656, 657 (1934). Thus, plaintiffs may recover in nuisance despite the otherwise nontortious nature of the conduct which creates the injury. *Id.*

---

**3.** The chemicals were detectable not only through laboratory processes but also by gross visual inspection. Experts reported a reddish discoloration and an oily surface in one section of the wetland, along with a pungent chemical odor. Doctor Kelly stated also that at one location chemicals seeped out of the ground as if from a spring.

In his brief defendant has accurately stated that the injury produced by an actionable nuisance "must be real and not fanciful or imaginary * * *." *See generally Blomen v. N. Barstow Co.*, 35 R.I. 198, 205, 85 A. 924, 926 (1913); Prosser, *Handbook of the Law of Torts* § 87 at 577 (4th ed. 1971). The defendant next suggests that the injuries in the case at bar are of the insubstantial, unactionable type. It is this statement, however, rather than the purported injuries, that is fanciful. The testimony to which reference is made in this opinion clearly establishes that defendants' dumping operations have already caused substantial injury to defendants' neighbors and threaten to cause incalculable damage to the general public. The Picillos' neighbors have displayed physical symptoms of exposure to toxic chemicals and have been restricted in the reasonable use of their property. Moreover, expert testimony showed that the chemical presence on defendants' property threatens both aquatic wildlife and human beings with possible death, cancer, and liver disease. Thus, there was ample evidence at trial to support the finding of substantial injury implicit in the trial justice's finding of public and private nuisance.[4]

■ The defendants' remaining contention is that Rhode Island case law requires plaintiffs to prove negligence as an element of the nuisance case and that plaintiffs failed to do so.[5] Generally, this court has not required plaintiffs to establish negligence in nuisance actions.[6] *See Citizens for Preservation of Waterman Lake v. Davis*, R.I., 420 A.2d 53 (1980); *Pucci v. Algiere*, 106 R.I. 411, 261 A.2d 1 (1970); *Rose v.*

*Standard Oil Co.*, 56 R.I. 272, 185 A. 251 (1936); *Braun v. Iannotti*, 54 R.I. 469, 175 A. 656 (1934); *Blomen v. N. Barstow Co.*, 35 R.I. 198, 85 A. 924 (1913). In one case, however, the Rhode Island Supreme Court refused to impose nuisance liability upon an oil refining company absent proof of negligence. *See Rose v. Socony-Vacuum Corp.*, 54 R.I. 411, 421, 173 A. 627, 631–32 (1934). The defendant asserts that the *Rose* case is apposite to and controls the case at bar. We disagree.

The facts of *Rose* are somewhat similar to the facts of the present case. The plaintiff, Manuel Rose, owned a fifty-seven-acre farm in East Providence, Rhode Island, on which he maintained a piggery and hennery. Rose drew drinking water for his family and for the hens from a fresh-water well dug on the property, and the pigs drank from a stream that traversed the farm. The well and the stream were fed by waters that percolated from an underground source.

The defendant in *Rose* was the owner of a large oil refinery and several storage tanks situated directly across the street from the plaintiff's farm. The refinery and the storage tanks discharged and leaked petroleum, gasoline, and waste products into basins, streams, and ponds on the defendant's property. These substances, however, did not remain in their natural repositories. Rather, the oil products percolated through the soil into the groundwater and discharged into the plaintiff's well and stream. The pollutants contaminated the plaintiff's drinking water, killing 700 hens and 75 breeding sows. The plaintiff insti-

---

4. On appeal our review of the trial justice's findings is very limited. We must uphold the trial justice's factual findings unless they are clearly wrong or unless the trial justice overlooked or misconceived material evidence. *Citizens for Preservation of Waterman Lake v. Davis*, R.I., 420 A.2d 53, 59 (1980); *Pucci v. Algiere*, 106 R.I. 411, 424, 261 A.2d 1, 9 (1970).

5. Although it may be that a finding of negligence is implicit in the trial judge's nuisance determination, the rescript contains no indication of a specific finding of negligence.

6. In *Braun v. Iannotti*, 54 R.I. 469, 471, 175 A. 656, 657 (1934), the court wrote:

" 'In cases of damage by nuisance it is considered that the injurious consequences resulting from the nuisance, rather than the act which produces the nuisance, is the cause of action * * *. Negligence of the defendant is not, ordinarily, an element.' "

Whether or not a nuisance is actionable absent proof of negligence depends upon the nature of the nuisance and the facts of the particular case. *Rose v. Standard Oil Co.*, 56 R.I. 272, 279–80, 185 A. 251, 254–55 (1936).

tuted suit against Socony-Vacuum, alleging private nuisance but not negligence.

The Superior Court sustained defendant's demurrer. On appeal, the Supreme Court framed the issue in the following terms:

"While the defendant could appropriate to its own use the percolating waters under its soil—providing that in so doing it was not actuated by an improper motive and was not negligent—can it, by the use to which it puts its land, deprive the plaintiffs of such waters by rendering them unfit for plaintiffs' use by contamination?" 54 R.I. at 418–19, 173 A. at 630.

The court held that the defendant could with impunity contaminate the plaintiff's drinking water if the defendant polluted nonnegligently. *Id.* at 421, 173 A. at 631–32. The court reasoned that because "courses of subterranean waters are * * * indefinite and obscure," rights to them are less easily definable than riparian rights to surface streams. Suggesting that it might be unjust to subject landowners to liability for the unforeseeable consequences of legitimate land uses, the court looked to the teaching of other courts that had considered the issue. Examination of the cases disclosed a split of authority; jurisdictions with primarily agricultural economies imposed nuisance liability without proof of negligence, whereas jurisdictions with primarily industrial economies reqired a negligence showing. The *Rose* court determined that petroleum products were vital to the highly developed industrial economy of the local area, and held as a matter of policy that injury of the type occasioned by the defendant's percolating pollutants was, absent negligence, "*damnum absque injuria.*" *Id.*

Since this court decided *Rose v. Socony-Vacuum* in 1934, the science of groundwater hydrology as well as societal concern for environmental protection has developed dramatically. As a matter of scientific fact the courses of subterranean waters are no longer obscure and mysterious. The testimony of the scientific experts in this case clearly illustrates the accuracy with which scientists can determine the paths of groundwater flow. Moreover, decades of unrestricted emptying of industrial effluent into the earth's atmosphere and waterways has rendered oceans, lakes, and rivers unfit for swimming and fishing, rain acidic, and air unhealthy. Concern for the preservation of an often precarious ecological balance, impelled by the spectre of "a silent spring," has today reached a zenith of intense significance. Thus, the scientific and policy considerations that impelled the *Rose* result are no longer valid. We now hold that negligence is not a necessary element of a nuisance case involving contamination of public or private waters by pollutants percolating through the soil and traveling underground routes.[7]

For the reasons stated, the defendants' appeal is denied and dismissed. The judgment of the Superior Court is affirmed. The papers in the case may be remanded to the Superior Court.

SHEA, J., did not participate.

---

**7.** It could well be argued that one who utilizes his land for abnormally dangerous activities or for storage of abnormally dangerous substances may be strictly liable for resultant injuries, even in the absence of a finding of nuisance or negligence. *See Rylands v. Fletcher,* [1868] L.R. 3 E & I App. 330; Prosser, *Handbook of the Law of Torts* § 78 at 505–16 (4th ed. 1971). In the case at bar the finding of both private and public nuisance makes it unnecessary to consider the doctrine of strict liability.