**Herbert H. WEIDA et al.**

v.

**John FERRY, Jr., d.b.a. Valley View Dairy Farm.**

**No. 83–245–Appeal.**

Supreme Court of Rhode Island.

June 5, 1985.

Aram Schefrin, Lovett Morgera Schefrin & Gallogly, Ltd., Providence, for plaintiffs.

Jeremiah R. Leary, Stetson W. Eddy, Leary & Holland, Tiverton, for defendant.

OPINION

KELLEHER, Justice.

This is a Superior Court civil action in which the plaintiffs, Herbert H. Weida and his wife, Claire M. Weida (the Weidas), sought equitable relief and monetary damages from the defendant, John Ferry, Jr. (Ferry), because of an alleged nuisance that had its roots in the manner Ferry operated a dairy farm. Since Ferry ceased his dairy operations in August 1982, we are concerned solely with the Weidas' claim for money damages and what occurred when this claim was tried before a jury in the Superior Court's Newport County Courthouse. The jury returned a verdict for Ferry. Thereafter, the trial justice denied the Weidas' motion for a new trial. This appeal then ensued.

In June 1974 the Weidas purchased a single-family residence located in the town of Middletown at 1 Wedgewood Drive. They paid $36,000 for the property. The husband, a mechanical engineer and technician, was employed by the United States Navy at its Underwater Systems Center in Newport. The wife worked as a catalog clerk for Sears Roebuck and Co. At trial time the Weidas were the parents of five children and the grandparents of eight children. They took occupancy of their new residence in September 1974.

A stone wall that ran along the dividing line between the Weida property and the farm that Ferry leased was about forty feet from the Weidas' home. The farm's feed lot was situated close by the wall. Ferry defined a "feed lot" as an area in which there was built a cement trough called a bunk feeder. Each day a truck would drive alongside the feeder, grain would be dumped into the feeder, and "the cows would eat the feed." During the period in question, Ferry estimated there were between eighty and a hundred cows in residence at the farm.

The Weidas apparently enjoyed the bucolic beauty of Ferry's enterprise until the spring of 1975 arrived. Then the temperatures began to rise. The fact that the herd's digestive tracts were transferring feed into a product known as manure became more evident. It was at this point that the flies arrived on the scene.

Mrs. Weida testified, "We just were bombarded with flies. * * * They were in the house; they were outside. They were terrible. * * * Gee, it was really hundreds of flies. We just had flies, flies, and more flies." The picnic table went unused, the summer family reunion was a disaster, fly specks covered the entire house, and the recently sanded floors in the living areas were fly spotted. According to Mrs. Weida, there were fly marks everywhere—on the drapes, the bathrooms, the woodwork, and the walls. The flies were biters, and in Mrs. Weida's words, "They hurt when they bite." The manure was also a source of distress for the Weidas since its odor was described as so terrible "you'd just think someone was sick." The Weidas' residence, which at one point had been painted white at the suggestion of an entomologist, was covered with black spots, which marked the places where the flies had come to rest. The flies would make their appearance in the spring and remain in the area until well into the fall, sometimes as late as Thanksgiving. Once the cold weather came, living at the Weida household became much more bearable.

A long-time member of the faculty of the University of Rhode Island, a specialist in pest control who also worked in cooperation with the State's Department of Environmental Management, identified the flies as "calcitrons" [sic] or "stable flies." When he visited the Weidas' residence, he saw flies everywhere. He described the outside of the house as totally spotted and explained that "no fly can live in any situation without having something come out of the back end, and those flies were no exception." This witness explained to the jury that the stable fly had a life expectancy of about one month and that during that period the female of the species could lay approximately 600 eggs. On his initial visit

to the Ferry farm, he was shocked because the area was a study in contradictions. The barn was absolutely clean, but the exterior of the premises was dirty. He classified the exterior condition as "one of the messier ones that I have seen." Manure, he noted, was an ideal breeding place for flies. As a result of his inspection, he recommended that Ferry use a pesticide known as Rabon, to be applied in proper solution with water, in the feed-lot area while the cattle were in the barn. Such action, he said, would reduce the propagation rate. This witness also recommended the use of a spring-tooth harrow to break up the ground in the feed lot. This procedure, in the witness's opinion, would have prevented the multiplication of the flies because their eggs would not hatch.

A real estate agent who examined the Weidas' property in the fall of 1980 reported that he had observed an extremely heavy residue on the exterior of the house and garage and also in various places in the interior of the house. He expressed the belief that until the problem was eradicated, the house couldn't be sold. A painting contractor estimated that it would cost $1,720 to repaint the house. This figure included the cost of preparation of the exterior surface.

Ferry testified concerning the measures he had taken to combat the flies, which measures included spraying the cows with an insecticide, an electrified fly zapper which was situated in the barn, and a "back oiler." The back oiler was described by the professor as a string of burlap bags that were tied together, each bag containing insecticide. As the cows passed through the bags, their backs would rub against the insecticide-soaked burlap. One of Ferry's witnesses testified that the feed-lot method of feeding was commonly used in the dairy industry and that he engaged in the same practices that Ferry described to reduce the fly population on the witness's farm.

Ferry also produced a real-estate expert who, after viewing the Weidas' home, expressed the belief that it did not look as if it needed any exterior maintenance. However, on cross-examination he conceded that he never got to see the side of the house that was facing the farm.

In his charge the trial justice told the jury that it was to consider this dispute as though it were a negligence action. Thus, he said, the burden of proof was upon the Weidas to establish Ferry's negligence. He also informed the jury that if it believed that the Weidas knew the risk in taking up residence in the vicinity of a farm, the jury must find that their action was barred because the Weidas assumed the risk. These statements are erroneous expressions of the law of nuisance; therefore, a new trial is required.

■ Recently, in *Wood v. Picillo*, R.I., 443 A.2d 1244, 1247 (1982), this court emphasized that the essential element of an actionable nuisance is that the plaintiffs have suffered harm or are threatened with injuries that they ought not to have to bear. Although the litigation in *Wood* involved claims of the existence of both a public and a private nuisance, the principle to which we have alluded applies equally well to the Weidas' claim. A private nuisance arises from the unreasonable use of one's property that materially interferes with a neighbor's physical comfort or the neighbor's use of his real estate. *Citizens for Preservation of Waterman Lake v. Davis*, R.I., 420 A.2d 53 (1980). In *DeNucci v. Pezza*, 114 R.I. 123, 329 A.2d 807 (1974), this court stressed that no one is required to suffer a neighbor's unreasonable use of his property even though that use may be permitted by a zoning ordinance. Over a half century ago it was emphasized that nuisance liability is distinguished from negligence liability because a nuisance claim is predicated upon an unreasonable injury rather than unreasonable conduct. *Braun v. Iannotti*, 54 R.I. 469, 175 A. 656 (1934). Consequently, the Weidas may recover damages from Ferry even though his conduct was nontortious in na-

ture. *Wood v. Picillo*, R.I., 443 A.2d at 1247.

The invocation of the theory of assumption of the risk brings to mind a defense often offered in litigation concerning alleged nuisance. The defense is called the doctrine of coming to the nuisance, and at common law it was defined thus:

> "If my neighbor makes a tan-yard so as to annoy and render less salubrious the air of my house or gardens, the law will furnish me with a remedy; but if he is first in possession of the air, and I fix my habitation near him, the nuisance is of my own seeking, and may continue." 2 Blackstone, *Commentaries on the Laws of England* 402 (17th ed. 1830).

Thus, before the turn of the century, the Federal Circuit Court relied on the doctrine in *Tuttle v. Church*, 53 F. 422, 426 (D.R.I. 1892), when Judge LeBaron B. Colt[1] of Rhode Island considered evidence on the question of enjoining the operation of a Portsmouth, Rhode Island, fish-processing plant whose products included fish oil and fertilizer. The plaintiff claimed that the operation produced noxious odors and polluted the waters of Narragansett Bay and the "Seaconnet" river. In rejecting the plaintiff's claim, Judge Colt relied to some extent on the coming-to-the-nuisance rationale when he observed:

> "If one voluntarily moves into a town or neighborhood where smoke or noxious gases abound, it may be presumed that he does so for sufficient reasons, and he should not be permitted to come into a court of equity and restrain the prosecution of industries already established, and upon which the business interests and welfare of the community may depend."

■ The doctrine has been modified so that one's coming to the nuisance no longer acts as an absolute bar to recovering damages in a nuisance action. This modification came from a recognition that an absolute bar to a finding of nuisance would, in effect, give the offending activity a perpetual servitude upon the land of its neighbors without the payment of any compensation. *Carpenter v. Double R Cattle Co.*, 105 Idaho 320, 332–33, 669 P.2d 643, 655 (Idaho Ct.App.1983); *see also Richmond Brothers, Inc. v. Hagemann*, 359 Mass. 265, 268, 268 N.E.2d 680, 682 (1971). We believe that one's coming to the nuisance is simply one factor that may be considered in determining whether or not a defendant's or a respondent's conduct was an unlawful interference with a neighbor's real estate. Prosser and Keaton, *The Law of Torts* 635 (5th ed. 1984).[2]

---

1. Congress, acting pursuant to Article III of the United States Constitution, passed the Judiciary Act of 1789, which in turn created the Circuit Courts and the District Courts. The principal jurisdiction conferred on the District Courts was original jurisdiction in admiralty. The Circuit Courts were given original jurisdiction over cases involving major federal criminal offenses and jurisdiction in diversity cases of actions at law or in equity, as well as appellate jurisdiction over the District Courts. Later, in 1891, with the enactment of the Evarts Act, came the creation of the Circuit Courts of Appeals. This legislation did not disturb the Circuit Courts' original jurisdiction but stripped them of their appellate jurisdiction. The Circuit Courts continued to act as trial courts in the criminal area and in diversity actions at law or in equity. However, the Judicial Code of 1911 abolished the Circuit Courts and transferred their jurisdiction to the District Courts. Since 1911 there has been no fundamental change in the basic system of a Supreme Court, Courts of Appeals, and

District Courts. 1 Moore, *Federal Practice* ¶ 0.2[1] at 11–14 (2d ed. 1985).

The diversity factor was noted by Judge Colt, who observed that the plaintiffs, Elias A. Tuttle and his wife Cornelia, were out-of-staters who spent their summers in the town of Tiverton in a house that was a mile and a half south of the fish-processing plant. Indeed, the plaintiff husband conceded that the suit was begun at the request of one of the counsel of record in order that "it might be brought in the United States court." In denying equitable relief, the trial judge listed as one of many reasons the circumstances under which this suit was brought.

2. The court in *Kellogg v. Village of Viola*, 67 Wis.2d 345, 227 N.W.2d 55 (1975), ruled that while the coming-to-the-nuisance principle might play a part in entertaining whether to enjoin an operation, it is totally irrelevant in a suit where the claim is for damages. We do not adopt such a view because, as Prosser and Keaton stress, such a position could result in a

The plaintiffs' appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court[3] for a new trial.

windfall to a plaintiff who purchases property at a depressed price because of its proximity to a nuisance such as a feed lot and then is allowed successfully to maintain a suit for either damages or abatement of the nuisance and, at the expense of the defendant, experience a substantial increase in the market value of the plaintiff's real estate. Similar sentiments have been expressed in Restatement (Second) *Torts,* § 840D, comment (c) at 176–77 (1979).

3. At trial some mention was made of G.L.1956 (1976 Reenactment) chapter 23 of title 2, as amended by P.L.1982, ch. 10, § 1, the Rhode Island Right to Farm Act, which in essence provides that no "agricultural operation" shall be enjoined as a public or private nuisance because of odors generated by generally accepted farming procedures or dust created during plowing or cultivating periods or the use of pesticides, rodenticides, insecticides, herbicides, or fungicides. "Agricultural operations" are defined as "any commercial enterprise which has as its primary purpose horticulture, viticulture, viniculture, floriculture, forestry, dairy farming, or aquaculture, or the raising of livestock, fur-bearing animals, poultry, or bees." Section 2–23–4. However, at trial time this legislation was not relevant because the Weidas were only entitled to money damages and not injunctive relief since Ferry ceased his dairy operations five months before trial began. We note, parenthetically, that the Rhode Island Right to Farm Act fails to include flies as a protected incident of farming impervious to injunctive relief as a public or private nuisance.