[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
The petitioners seek a judgment for damages for diminution in value to their property which allegedly was caused when the State Properties Committee, pursuant to Chapter 6 of Title 37 and Chapter 15 of Title 46, R.I. Gen. Laws 1956 (1984 Reenactment) acquired a portion of their property by condemnation for the purpose of water supply. Jurisdiction in this court is pursuant to R.I.G.L. 1956 (1984 Reenactment) § 37-6-17.
FACTS AND TRAVEL OF THE CASE
The petitioners are the owners in fee simple of certain property located in Richmond, Rhode Island. Prior to March 12, 1985 the petitioners' property consisted of 50.5 acres. On March 12, 1985 the state condemned 12.66 acres of land and two easements of 5,427 and 4,070 square feet. The petitioners' site is zoned R-80 which allows single family homes to be constructed on land of at least 80,000 square feet. The State's Water Resources Board approved a valuation of $44,780 with respect to the condemnation and remitted a check in that amount dated January 8, 1986 to the petitioners.
ANALYSIS
The state's appraisal of the condemnation was limited to the property actually taken by the state and did not make any allowance for diminution in the fair market value of the remaining land held by the petitioners. The state's expert opined that the remaining land would not incur any severance damage.
The measure of damages applicable to a partial taking of property is well settled in Rhode Island:
 The measure of damages applicable in a case involving a partial taking is the value of the land taken at the time it is taken together with any special or peculiar damages which result to the remaining land, or, to put it otherwise, the owner of such land is entitled to full compensation for such damages as he sustains by reason of the taking.
See Hetland v. Capaldi, 103 R.I. 614, 616 (1968). See alsoD'Angelo v. Director of Public Works, 89 R.I. 267 (1959).
The experts of both the petitioner and the state, in the instant case, agreed that the best use of the property was a residential development. If experts of opposing sides agree the most advantageous and valuable use of property is residential, then that is the use that should be utilized in establishing a condemnation award. Sweet v. Murphy, 473 A.2d 758, 761 (R.I. 1984). The court stated "[c]ompensation should be based on the most advantageous and valuable use. The sum required to be paid the owner . . . does not depend on the uses to which he has put it but is to be ascertained by just consideration of the uses for which it is suitable." Id. at 761. See also Olson v. UnitedStates 292 U.S. 246, 255 (1934). In light of Sweet, this court must prepare a remedy based upon the most valuable use for which this condemned land and remaining land is suitable and the extent to which the state's condemnation harmed such potential use.
In determining the effect condemnation had on the value of the property, it is first necessary to determine what a ready and willing buyer would pay to a ready and willing seller for similar property. Atlantic Refining Co. v. Director of Public Works,233 A.2d 423, 429 (R.I. 1967). "This legal fiction is more readily related to comparable sales since reason suggests that a comparable sale in the open market is strongly persuasive of the proposition that the purchase price freely agreed upon is a fair representation of the value of the similar property taken by eminent domain. Id. at 429. See also Hervey v. City ofProvidence, 47 R.I. 378 (1926). After determining the value of said property prior to condemnation, the court must determine the value of the remaining property. This court's recognition of the aforementioned Hetland case and its pertinent parts underscores the need to compensate the petitioners for any diminution in value of their remaining property interest caused by the public well and its cone of influence.
The state's engineering consultants, Lee Pare Associates, reported to the Water Resources Board that a test well constructed in the condemned area pumped at a rate of withdrawal of 520 gallons per minute, or about 750,000 gallons per day. With the state's well pumping at this rate, the cone of influence or draw of water would extend outwards one thousand feet from the site of the well. Since the site of the well is four hundred feet from the petitioners' boundary, the cone of influence would extend approximately six hundred feet into the petitioners' remaining land. This estimate assumes that the well remains four hundred feet from the boundary. In determining damages in condemnation proceedings, "if compensation is to be just it must be measured [by the court] by what the condemnor can do and not by what he intends to do, it being the rule that damages are to be assessed on the most injurious method of construction that is reasonably possible." Sullivan v. Marcello, 100 R.I. 241, 254 (1965). Thus, this court must determine all damage that would result from a well being placed on the boundary of the condemned property with its cone of influence affecting substantially all of the remaining land held by the petitioners. The court finds that such an adverse effect is "reasonably possible" and could manifest itself in a variety of forms. Those forms could include the state's increasing the volume of water pumped from the existing well, adding wells, or locating new wells closer to the property line between the condemned property and the remaining property. Certainly, any of such potential uses are "reasonably possible."
The central contention of the petitioners builds on the fact that this cone of influence has made the remaining area extremely sensitive and substantially harmed its most valuable use, residential development. The petitioners further argued that any would-be developer would pay considerably less for the land given its vulnerable condition and the potential liability if development pollutes the subterranean waters. The petitioners cited Wood v. Picillo, 443 A.2d 1244 (R.I. 1982) which held that negligence was not a necessary element to prove an action in nuisance against one who polluted private or public waters. The relevant portions are as follows:
 As a matter of scientific fact the courses of subterranean waters are no longer obscure and mysterious. The testimony of the scientific experts . . . illustrates the accuracy with which scientists can determine the paths of groundwater flow. Moreover, decades of unrestricted emptying of industrial effluent into the earth's atmosphere and waterways has rendered oceans, lakes and rivers unfit for swimming and fishing, rain acidic and air unhealthy. Concern for the preservation of an often precarious ecological balance, impelled by the spectre of "a silent spring," has today reached a zenith of intense significance. . . . We now hold that negligence is not a necessary element of a nuisance case involving contamination of public or private waters by pollutants percolating through the soil and traveling underground routes.
Wood v. Picillo, 443 A.2d 1244, 1249 (R.I. 1982).
The Wood case overruled Rose v. Socony-Vacuum Corp.,54 R.I. 411 (1934), a long standing precedent. In Rose the court held that the defendant was not liable for contaminating the plaintiff's groundwater if he did so non-negligently. The court posited that the nature of subterranean waters was indefinite and obscure and rights to them not easily definable. Id. at 421.
Rhode Island courts have demonstrated they will now consider the pollution of subterranean waters nuisance per se. Advances in the science of groundwater hydrology and increased interest in protecting the purity of the state's waters are factors in the court's direction. Wood v. Picillo, 443 A.2d 1244, 1249 (R.I. 1982).
The petitioners' contention that the possible liability of developers for non-negligent polluting will act to diminish the resale value for purposes of development, can be viewed with greater credibility in light of Wood and Friends of theSakonnet v. Dutra, 738 F. Supp. 623 (D.R.I. 1990).
Even predecessors in interest could be found liable under nuisance if damage took place during the time they had ownership and control of the instrumentality. In this case the instrumentality was a faulty septic system. The court explained as follows:
 This Court has discovered no Rhode Island (or other) precedent that bars recovery of nuisance damages simply because the defendants no longer control the instrumentality alleged to have caused the nuisance. If Rhode Island courts allow suits for nuisance damages to go forward although the nuisance itself has already been abated, see Weida v. Ferry, 493 A.2d 824, 826 n. 3 (R.I. 1985), it follows that suits should be allowed, if within the statute of limitations, against one who is alleged to have caused damages by a nuisance even if that person no longer controls the alleged nuisance. In both situations, the damage caused by the defendant's alleged operation of a nuisance is in the past. . . . The paramount question is whether the defendant was in control of the instrumentality alleged to have created the nuisance when the damage occurred.
Friends of Sakonnet v. Dutra, 738 F. Supp. 623, 633-34 (D.R.I. 1990).
On the basis of the aforementioned case law and the increased public awareness of maintaining a clean environment, this court does recognize the heightened sensitivity of the petitioners' remaining property interest as a result of the public well and the cone of influence. It also follows that an informed purchaser or developer would recognize this sensitivity and the risks associated with it. It is for these reasons that this court does find that the state's condemnation of 12.66 acres of the petitioners' land for use as a public well has created appurtenant damage to the remaining land.
The State of Rhode Island has presented several arguments, most of which have already been addressed. The first contention raised by the defendant was the fact that the footage requirement from the well site to the property line was four hundred feet as formulated by the R.I. Department of Health. The defendant argued that since the well was four hundred feet from the petitioners' property line the defendant had complied with the regulation. The defendant added that there was no competent testimony that demonstrated that the remaining portion could not be utilized for its best use, as determined by experts of both parties, a residential development.
On this point by the defendant, the petitioner has never disagreed. In fact, a residential development could be built on the remaining property. The problem that would confront a would-be developer is the potential liability he may be exposed to if it is later found that the subterranean water that feeds the well is polluted. The petitioner has argued and presented evidence that because of the increased sensitivity of the area the potential risk would dramatically reduce the value of the petitioners' parcel. The court agrees.
The defendant also compared the instant case to an inverse condemnation. In using Annicelli v. Town of South Kingstown,463 A.2d 133, (R.I. 1983), the defendant argued when all reasonable, beneficial use of the property is not rendered an impossibility, the property owner should not be compensated. The defendant's attempt to analogize the Annicelli case to the case at bar fails for one basic reason; the petitioners have never argued a constructive taking. The petitioners have argued that the taking resulted in damages to the remaining land and underHetland they should be compensated for those damages. Hetlandv. Capaldi, 103 R.I. 614, 616 (1968).
As pertains to the comparable sales method, the court finds the testimony offered by Mr. Accetta most credible due to his level of familiarity with its use, the detail in which the evidence was offered, and the underlying analysis which the court finds to be reliable. Alternatively, the court views state's expert, J.W. Riker, as less credible, due in part to his dissatisfaction with the Rhode Island Supreme Court mandated appraisal method enunciated in Hetland v. Capaldi,103 R.I. 614, 214 A.2d 155 (1968). Moreover the court finds that Riker's testimony contained less underlying data and analysis than Mr. Accetta's testimony. The Court therefore accepts that part of Mr. Accetta's testimony based on Hetland and rejects Mr. Riker's testimony for the forementioned reasons.
The court finds certain portions of Accetta's testimony regarding positive adjustments in value per square foot of petitioners' land unacceptable, and those adjustments based on planned subdivision, availability of good drinking water, and waterview or waterfront lots. Moreover, the court must also reject the increased valuation attributed to lots adjacent to the river as arbitrary and without objective data. In a 1977 case the supreme court reasoned that significant factors, such as location and character of the property can affect its comparability but where there is evidence of comparable sales, it will operate to exclude the use of other factors in determining fair market value. Corrado v. Providence Redevelopment Agency,370 A.2d 226, 230 (R.I. 1977). Hervey v. City of Providence, 133 A. 618, 619 (R.I. 1926). The adjustments are unacceptable because there was no underlying data to support their use. Although Mr. Accetta is a respected expert in his field, the mere fact that he is qualified as an expert is not a sufficient basis to support the use of the three adjustments. Some objective data must be presented to substantiate those adjustments. See L'Etoile v.Director of Public Works, 89 R.I. 394, 402 (1959).
In the case at bar, the petitioners' real estate expert, Joseph Accetta, utilizes the comparable sales method by selecting seven 1985 sales in Richmond that he believed were similar to the petitioners' land. This court recognizes the comparable value methodology which is adopted in Wordell v. Wordell,470 A.2d 669 (R.I. 1984). The court in Wordell stated "in cases involving value of real estate [the supreme court] has suggested that such value must be established, wherever feasible, on the basis of comparable sales cited by an expert witness who has laid a prior foundation consisting of the reasons or factors upon which he has relied in arriving at his opinion". Id. at 667. See also L'Etoile v. Director of Public Works, 89 R.I. 394, 402 (1959). The court established that it "[does] not depart from the general rule that value of real estate, whether for purposes of compensation in eminent domain or otherwise, should be established by expert witnesses familiar with values in the locality where the real estate is situated. Wordell v. Wordell,470 A.2d 665, 667 (R.I. 1984).
Accordingly, on the basis of Mr. Accetta's testimony which the court finds credible, the following calculations are made in determining the award of damages to be made to the petitioner.
 1. The court finds that the value per square foot of the property before condemnation is $.31. That amount represents both median and modal value per square foot presented in Mr. Accetta's appraisal without the benefit of certain positive adjustment advocated by Mr. Accetta which the court has rejected.
 2. Based on the subdivision analysis by Mr. Accetta which the court finds to be credible and which was not challenged with a countervailing expert opinion, the court finds that nineteen homesites of 80,000 square feet could have been developed prior to the condemnation.
 3. The value of each homesite would be $24,800 (i.e. $.31 x 80,000 sq. ft.)
 4. The value of the property before condemnation, if subdivided, was $471,200. (i.e. 19 sites x $24,800. per site)
 5. Reducing that amount, $471,200. by the hard and soft costs associated with the subdivision, which are $233,000., would bring a fair market value prior to condemnation of $238,200.
 6. The court finds that the property remaining after condemnation is without utility for development purposes. The court accepts Mr. Accetta's testimony that land without utilities should be valued at 25% of its fair market value. In that 14 of the 19 homesites could have been developed on the remaining property but for the original condemnation, the value of such property would be:
 $238,200. x .736 x .25 = $43,829.00
 7. The damage to petitioners' land can be summarized as follows:

 $238,200. Value of entire parcel prior to condemnation
 43,829. Value of property remaining after condemnation
 44,780. Compensation previously remitted at time of
 condemnation

 8. The court thus finds as a result of the condemnation that the petitioner has incurred damages in the amount of $149,591.
Judgment shall enter for the petitioner in the amount of $149,591. plus statutory interest to be calculated by the clerk.