Argued September 7, 1972, affirmed February 1, petition for
rehearing denied February 27, 1973

SPENCER CREEK POLLUTION CONTROL
ASSOCIATION ET AL, *Respondents, v.*
ORGANIC FERTILIZER CO.,
*Appellant.*

505 P2d 919

*Lawrence O. Gildea,* Eugene, argued the cause for appellant. With him on the briefs were Gildea, Speer & McGavic, P.C., Eugene.

*Edward R. Fechtel,* Eugene, argued the cause for respondents. With him on the brief were Husband, Johnson & Frye, Eugene.

O'CONNELL, C.J.

This is a suit in equity brought by the Spencer Creek Pollution Control Association to enjoin defendants, who operate a cattle feedlot, from interfering with the use and enjoyment of the plaintiffs' properties and to recover damages. Defendant appeals from a decree in favor of plaintiffs.

The members of the Association are owners of real property in the general vicinity of the feedlot

operation on the outskirts of Eugene, Oregon. The area is in a transitional stage, changing from agricultural to residential uses. Some of the plaintiffs raise livestock or poultry on their premises for profit or for pleasure. Others use their property primarily for residential purposes.

The feedlot operation in question was commenced in 1955 by defendant's predecessor in title on a 40-acre tract of land. Defendant purchased the land and business in 1968. The record is silent as to the number of cattle kept on the feedlot during the period from 1955 until December of 1968, except that there were about 1,000 head on the premises just prior to sale. Defendant took possession in January of 1969, and thereafter began to rehabilitate and improve various structures which had fallen into disrepair. By late January of 1970, a "lagoon" or "holding pond" waste management system was completed whereby contaminated liquid run-off would be trapped and periodically sprayed onto adjacent land owned by defendant. An additional 55 acres were purchased later that year to serve as receiving land for the effluent and for pasturage. Defendant's total investment at the time of trial, without cattle, was $286,500.

Confinement feeding of livestock is a relatively new production technique in Oregon. Defendant's feedlot is small as such operations go, with a maximum capacity of about 1,200 head. Cattle are either purchased or taken under contract by defendant and are fattened to market weight. They are fed combinations of grain and vegetable waste. The manure produced by the cattle is sold as fertilizer.

Plaintiffs complain that from the time defendant purchased the feedlot the sewage from the feedlot

operation ran onto some of their properties, and that the accumulation of animal and vegetable waste caused unpleasant odors and a proliferation of flies and other insects. Defendant concedes that such run-off took place in the winters of 1969 and 1970, but contends that its waste management program was still underway and that, in any event, its feedlot does not constitute a nuisance.

On January 11, 1971, the trial judge entered his tentative findings of fact, concluding that defendant's operation did constitute a nuisance. On May 10, 1971, a decree was entered which forbade any construction on the 55 acres previously mentioned which defendant had added to its operation, and enjoined the pollution of Spencer Creek and neighboring lands through the run-off of contaminated liquids. The decree also required the defendant to continue its waste management and nuisance control plans and experimentation, and imposed a limit of 600 head of cattle on defendant's feedlot operation. In addition, two adjacent home-owners were awarded damages of $1,850 each, and three plaintiffs on whose lands contaminated liquids had flowed were awarded damages of $300 each. All other plaintiffs were awarded $15 each in nominal damages.

The transcript of testimony is over 1,300 pages in length, and records the testimony of some 47 witnesses. The trial court found that a nuisance was created by the operation of the feedlot. We have reached the same conclusion from a reading of the record.

Although defendant insists that it has taken measures to obviate any future interference with the reasonable use and enjoyment of surrounding lands, the evidence, a part of which was adduced through the

testimony of expert witnesses, shows that defendant's operation, unless limited as proscribed by the trial court's decree, could not be carried on in a manner which would avoid pollution or the creation of noxious odors and the propagation of flies and other insects. This was true even after the purchase by defendant of the additional 55 acres of land to be used to receive the surplus effluent, principally because the character of the soil in that area is such that its capacity to absorb liquid waste is limited, particularly in the wet season of the year.

■ Defendant asserts that because the feedlot commenced operation in 1955, which antedated the acquisition of the property by all members of the plaintiff association except three, plaintiffs should be precluded from recovery under the doctrine popularly known as "coming to the nuisance." The prior existence of an objectionable condition is one factor to be considered in determining whether a nuisance exists.⊙

■ In the present case the evidence does not reveal whether there was a nuisance at the time the plaintiffs purchased and occupied their respective parcels of land. It is true that the feedlot was in operation at the time plaintiffs purchased their land, but the extent of the interference with the various surrounding owners at that time is not known. We do have the testimony of one of the plaintiffs to the effect that when she moved to the property "there was a smell that was insignificant to us and flies that we regarded normal to living in the country." It is our conclusion that the record will not support the application of the "coming to the nuisance" doctrine.

---

⊙ E. St. Johns Shingle Co. et al v. Portland, 195 Or 505, 246 P2d 554 (1952). See Note, Torts—Nuisance, "Coming to the Nuisance," 32 Or L Rev 264 (1953).

Under its second assignment of error defendant contends that the court erred in restraining defendant from having more than 600 head of cattle on its premises at any one time. The 600 head limitation in the decree undoubtedly was based, in part at least, upon the testimony of Paul Rath, an engineer employed by the State of Oregon Department of Environmental Quality, who had inspected defendant's operation and had concluded that defendant's waste control facilities were adequate, on the assumption that the feedlot would accommodate only 600 head of cattle producing two cubic feet of waste per animal per day.

Rath's computation was based on 600 head of full grown animals, weighing approximately 1,200 pounds per animal. It was established that the amount of waste produced by an animal is proportionate to its weight. It follows, as defendant contends, that its waste control system was adequate to accommodate more than 600 animals if they were not full grown. As defendant points out, if its system is adequate to handle the waste of 600 animals at a weight of 1,200 pounds, its system is adequate to handle the waste of 1,200 animals at 600 pounds.

From the colloquy between the trial judge and the witnesses, it is clear that he was fully aware of the factor of weight of the animal in relation to its production of waste. The problem of framing a decree in this regard was complicated, however, by the fact that the animals were moved in and out of the feedlot in such a way that there was not a constant number, and by the fact that since their weight was increased by feeding there was not a constant weight. It appears from the evidence that sometimes there would be 600 full weight animals in the feedlot at a particular time.

Thus, in answering the trial judge's inquiry, one of defendant's witnesses replied, "after you have them there for four months, then you'd have six hundred full grown, and they'd be ready to go."

■ Moreover, there are factors other than the amount of waste produced by the animals which could be relevant in limiting the number of animals to 600. One of the sources of annoyance to the neighboring owners was the odor from the vegetable waste used to feed the cattle. The increase in the volume of such waste used to feed additional cattle could add to the annoyance from this source. Similarly, an increase in the number of cattle would tend to increase the fly population which was another major source of annoyance to the surrounding owners. Under these circumstances, we think that the limitation imposed by the trial court was reasonable.

■■ The defendant next contends that there was no evidence to support the award of $1,850 damages to each of two plaintiffs, and $300 to each of three plaintiffs. Defendant argues that since the alleged nuisance was temporary the measure of damages is the depreciation of the fair market rental value of the premises during the period of the nuisance. There is no evidence in the record showing this depreciation in rental value. But this does not conclude the matter. It is proper in a nuisance case to award damages for discomfort, inconvenience and annoyance actually suffered, distinct from or in addition to damages for depreciation in value of the property or its use.[2] We may assume

---

[2] *See* Annotation: Nuisance as entitling owner or occupant of real estate to recover damages for personal inconvenience, discomfort, annoyance, anguish, or sickness, distinct from, or in addition to, damages for depreciation in value of property or its use, 142 ALR 1307 (1943). *See also,* Porges v. Jacobs, 75 Or 488, 147 P 396 (1915).

that the trial court awarded damages on this basis. We have no reason to assume that the amount of the award was unreasonable.

We find no merit in defendant's other contentions.

■ Plaintiffs have cross-appealed from that part of the decree which permits defendant to use a 45-acre parcel of land acquired after the filing of the complaint. The land was acquired to provide an area upon which to spray effluents collected in the "holding" ponds. The decree permitted this use. Plaintiffs argue that the decree thus sanctions an enlargement of a non-conforming use in violation of a county zoning ordinance. In 1966 the area in question was zoned AGT (Agricultural, Grazing, Timber). Assuming, without deciding, that the feedlot itself is a non-conforming use under the county ordinance, the use of the specific 45-acre tract permitted by the decree is not an extension or enlargement of the non-conforming use. The spraying of effluents on the 45 acres serves to fertilize the land. This is a conforming use; it is not made non-conforming simply because at the same time it is also beneficial in the operation of the feedlot.

The decree of the trial court is affirmed.