669 P.2d 643

Adrian CARPENTER and Ruth Carpenter, husband and wife; John Eisenbarth and Violet Eisenbarth, husband and wife; J. Keith Jones and Patricia Jones, husband and wife; Kenneth F. Skow and Margie Skow, husband and wife; Duane Wiggins and Rosemary Wiggins, husband and wife; Gary Lewallen and Carol Lewallen, husband and wife, Plaintiffs-Appellants,

v.

The DOUBLE R CATTLE COMPANY, INC., the Sunnyside Feed Lot Company, Inc., and the Idaho Feed Lot Company, Inc., Defendants-Respondents.

No. 13750.

Court of Appeals of Idaho.

Aug. 31, 1983.

Petition for Review Granted
Nov. 10, 1983.

Daniel T. Eismann, Eismann Law Offices, Homedale, for plaintiffs-appellants.

Robert M. Tyler, Jr., Elam, Burke, Evans, Boyd & Koontz, Boise, for defendants-respondents.

Andrew Harrington, Anderson, Kaufman, Ringert & Clark, Boise, for Amicus Curiae, Food Producers of Idaho, Inc., and Western States Meat Ass'n, on rehearing.

## ON REHEARING

This opinion supersedes the Court's prior opinion issued on August 31, 1982, which is withdrawn.

BURNETT, Judge.

Dean William Prosser once observed, "There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance'." W. PROSSER, HANDBOOK OF THE LAW OF TORTS, § 86, at 571 (4th ed. 1971). Today we review a case that has thrust us into the jungle of nuisance law. We are asked to define the legal test for determining whether an intended use of property, which incidentally produces adverse effects upon neighboring properties, constitutes a nuisance.

This lawsuit was filed by a group of homeowners who alleged that expansion of

a nearby cattle feedlot had created a nuisance. The homeowners claimed that operation of the expanded feedlot had caused noxious odors, air and water pollution, noise and pests in the area. The homeowners sought damages and injunctive relief. The issues of damages and injunctive relief were combined in a single trial, conducted before a jury. Apparently it was contemplated that the jury would perform a fact-finding function in determining whether a nuisance existed and whether the homeowners were entitled to damages, but would perform an advisory function on the question of injunctive relief. The district judge gave the jury a unified set of instructions embracing all of these functions. The jury returned a verdict simply finding that no nuisance existed. The court entered judgment for the feedlot proprietors, denying the homeowners any damages or injunctive relief. This appeal followed. For reasons appearing below, we vacate the judgment and remand the case for a new trial.

The homeowners contend that the jury received improper instructions on criteria for determining the existence of a nuisance. The jury was told to weigh the alleged injury to the homeowners against the "social value" of the feedlot, and to consider "the interests of the community as a whole," in determining whether a nuisance existed. In Part I of this opinion we consider the adequacy of the record upon which to review the jury instructions. In Part II we establish an historical framework for reviewing the instructions, by examining the development of American nuisance law. In Part III we turn to pertinent sections from the nuisance chapter of the RESTATEMENT (SECOND) OF TORTS (1977). We explain how these sections limit the utilization of such concepts as "social value" and "the interests of the community as a whole" in determining whether a nuisance exists. We discuss the implications of these sections; and we adopt them. Finally, in Part IV, we return to the jury instructions in this case, holding them to be erroneous and offering guidance to the trial court upon remand.

## I

The feedlot proprietors contend that we are precluded from reviewing the jury instructions because the appellant homeowners have not furnished a full record of the proceedings below. The homeowners have provided a record embracing the items automatically included in the clerk's record under I.A.R. 28; all jury instructions requested or given; a reporter's transcript of colloquies between the district court and counsel concerning the jury instructions; and the exhibits produced at trial. We have not been furnished a full reporter's transcript of the trial itself, which consumed approximately two weeks. We may safely assume that the cost of producing such a transcript would have been substantial.

The proprietors invite our attention to the well-established propositions that error in the trial court is never presumed, and that an appellant has the burden of making an affirmative showing of error. As a corollary to these propositions, it has been held that, without a transcript of the evidence presented in the trial court, an appellate court will presume the jury instructions to be supported by the evidence. *E.g., Towers v. Johnson,* 11 Ariz.App. 455, 465 P.2d 592 (1970). However, this corollary is inapposite to the present appeal. The homeowners have challenged the jury instructions, not upon the ground that these instructions varied from the evidence at trial, but upon the ground that they misstated the law of nuisance. We need not compare the instructions to the evidence in order to determine whether the instructions contained defects of law.

█ The proprietors also urge, in the alternative, that even though it may be possible to review jury instructions for legal error without a trial transcript, it is not possible to determine whether any such error was prejudicial and therefore reversible. We recognize that a party attacking a jury instruction must show not only error but resultant prejudice. *E.g., Packard v. Joint School Dist. No. 171,* 104 Idaho 604, 661 P.2d 770 (Ct.App.1983). However, a tran-

script of evidence is not the only means of identifying prejudice. Our Supreme Court has held that where instructions on a material point create ambiguity or uncertainty, the error will be deemed prejudicial. *Yacht Club Sales & Service, Inc. v. First Nat'l Bank of N. Idaho,* 101 Idaho 852, 623 P.2d 464 (1980). Such confusion or ambiguity may arise from incomplete instructions on a material point. *McNichols v. J.R. Simplot Co.,* 74 Idaho 321, 262 P.2d 1012 (1953). In the present case, the homeowners argue that the jury instructions contained an incomplete statement of criteria for determining the existence of a nuisance. The question, then, is whether these criteria were material to the outcome of the trial.

Although the record on appeal is limited, the detailed minute records of the court and the exhibits indicate the general nature of evidence adduced. There was evidence tending to show a cattle operation involving several thousand head at the feedlot; swarms of insects on various properties near the feedlot; flocks of birds near the feedlot; manure piles at the feedlot; and drainage of waste water from the feedlot. The evidence identified the nature of the homeowners' properties and fixed their location relative to the feedlot. There was expert testimony regarding the economic values of the properties. The evidence included monthly cattle totals at the feedlot during the alleged expansion of the facility. A comprehensive plan and a zoning ordinance of Washington County were presented. At the close of the homeowners' evidence, and at the conclusion of trial, the proprietors moved for dismissal of the homeowners' complaint. Both motions were denied.

We cannot, and do not, form any view regarding the specific content or weight of the evidence presented. But the record is adequate to show that existence of a nuisance was a question squarely framed before the jury. We conclude that the jury instructions concerning criteria for determining the existence of a nuisance were material to the case. Accordingly, we reject the feedlot proprietors' contention that

the merits of the homeowners' challenge to those instructions should not be considered.

## II

The concept of nuisance originated in the law of property. At common law, a distinction was maintained between two encroachments upon property rights—interference with possession of land, and interference with the use and enjoyment of land. The first type of encroachment was subject to an "assize of novel disseisen," a remedy for trespass. The latter form of encroachment was subject to an "assize of nuisance," a remedy for a variety of invasions which diminished the owner's enjoyment of his property without dispossessing him of it. Thus, nuisance and trespass have common roots in property law, and occasionally it is difficult to distinguish between them. But where an invasion of property is merely incidental to the use of adjoining property, and does not physically interfere with possession of the property invaded, it generally has been classified as a nuisance rather than as a trespass. *See* cases collected in 58 AM.JUR.2D *Nuisances,* § 2, 556–57 (1971).

The early concepts of nuisance and trespass shared the common law's reverence for property rights. Invasions of property were deemed wrongful *per se,* and the parties responsible for such invasions were subject to a form of strict liability. Thus, in the famous case of *Rylands v. Fletcher,* L.R. 1 Ex. 265 (1866), *aff'd* L.R. 3 H.L. 330 (1868), an English court held that the owner of a reservoir would be liable to the owner of adjacent property for any injury caused by escaping water. The court stated:

> We think that the true rule of law is, that the person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief if it escapes, must keep it in at his peril, and, if he does not do so, is prima facie answerable for all the damage which is the natural consequence of its escape. [L.R. 1 Ex. at 279.]

Although a physical intrusion by water might have been viewed as a trespass, rather than as a nuisance, the court noted that

the result would have been the same regardless of whether the mischief was caused by "beasts, or water, or filth, or stenches." *Id.* at 280. Thus, the English concept of nuisance was broad, and it carried remedies similar to those available for trespass.

The property-oriented, English concept of a nuisance had its analogue in early American law. In one illustrative case of the nineteenth century, an American court held that title to land gave the owner the right to impregnate the air with odors, dust and smoke, pollute his own water and make noises, provided that he did not substantially interfere with the comfort of others or injure the use or enjoyment of their property. *Pennoyer v. Allen,* 56 Wis. 502, 14 N.W. 609 (1883).

This broad description of nuisance was incorporated into Idaho law. Idaho Code § 52–101, which has antecedents dating to 1881, defines a nuisance as "[a]nything which is injurious to health or morals, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property...." The statutory remedies are similarly broad. Idaho Code § 52–111 empowers "any person whose property is injuriously affected, or whose personal enjoyment is lessened by the nuisance [to bring an action] ... and by the judgment the nuisance may be enjoined or abated, as well as damages recovered." Both private and public nuisances in Idaho may be the subjects of such actions brought by affected individuals, and the available remedies are the same in both categories. *See* I.C. §§ 52–102, 107, 111.

However, as the English concept of nuisance was assimilated into American law, it underwent a transformation. It ceased to be solely a creature of property law. As exemplified by the Idaho statutes, nuisance law came to protect life and health, as well as property. A nuisance signified not merely an infringement of property rights, but a wrong against both person and property—a tort.

American tort law in the nineteenth and early twentieth centuries was founded upon the rock of "fault." As the notion of fault burrowed into the concept of nuisance, the strict liability which had attended nuisance in property law began to deteriorate. American courts stressed that liability for nuisance would arise only from "unreasonable" uses of property. In some cases, the courts began to treat nuisance as a form of conduct rather than as a condition affecting the enjoyment of property. *E.g., Francisco v. Furry,* 82 Neb. 754, 118 N.W. 1102 (1908). This position later fell into disfavor. *E.g., Riter v. Keokuk Electro-Metals Co.,* 248 Iowa 710, 82 N.W.2d 151 (1957); *Smith v. City of Ann Arbor,* 303 Mich. 476, 6 N.W.2d 752 (1942).

However, American emphasis upon the element of reasonableness persisted. Our courts also underscored the distinction between conditions which are inherently nuisances (nuisances per se) and those conditions which may or may not constitute nuisances, depending upon the surrounding circumstances (nuisances per accidens). Of cases in the latter category, it became customary for the courts to say that whether an invasion of another's enjoyment of property was unreasonable would depend upon all circumstances in the case. These circumstances typically would include the location of the claimed nuisance, the character of the neighborhood, the nature of the offending activity, the frequency of the intrusion, and the effect upon the enjoyment of life, health and property. *E.g., York v. Stallings,* 217 Or. 13, 341 P.2d 529 (1959); *Reber v. Ill. Cent. R.R.,* 161 Miss. 885, 138 So. 574 (1932).

Moreover, the American transformation resulted in diminished application of the principle—derived from property law—that where property rights were substantially impaired by a nuisance, the complaining party was entitled to an injunction. This principle, which had complemented the property-based concept of strict liability, entitled a property owner to block an offensive activity on neighboring property, regardless of disparate economic conse-

quences. American courts apparently found this approach ill-suited to the demands of a developing nation.

There evolved two lines of American response to the problem of injunctions. One response was to narrow the scope of cases in which injunctions would be granted, while continuing to recognize an entitlement to damages for injury to property rights. Thus, in *Clifton Iron Co. v. Dye*, 87 Ala. 468, 6 So. 192 (1889), the Alabama Supreme Court held that a mining company would not be enjoined from washing its ores simply because the operation polluted a stream below. The court held that the aggrieved parties' recourse was in damages. Similarly, in *New York City v. Pine*, 185 U.S. 93, 22 S.Ct. 592, 46 L.Ed. 820 (1902), the United States Supreme Court held that two farmers would not be entitled to an absolute injunction against construction of a dam designed to enhance the water supply of the city, even though it adversely affected their properties. However, the Supreme Court held that a conditional injunction would issue unless the farmers were compensated in damages. Other illustrative cases from that era, in which injunctive relief was withheld, but the availability of damages was affirmed, include *Bartel v. Ridgefield Lumber Co.*, 131 Wash. 183, 229 P. 306 (1924), and *Galveston H. & S.A. Ry. v. DeGroff*, 102 Tex. 433, 118 S.W. 134 (1909).

Ultimately, the approach exemplified by these cases developed into the "comparative injury" doctrine. Under this doctrine, the comparative benefits and hardships of discontinuing one activity for the protection of another would be weighed in determining whether injunctive relief or damages represented the more appropriate remedy for a nuisance. The Idaho Supreme Court adopted the comparative injury doctrine in *Koseris v. J.R. Simplot Co.*, 82 Idaho 263, 352 P.2d 235 (1960). As explained later in this opinion, our Supreme Court in *Koseris* acknowledged the right to recover damages for the invasion of one's property, even where the comparative injury doctrine might bar injunctive relief.

The second line of American response to the injunction problem was to narrow the scope of cases in which nuisances were found to exist. This was achieved by incorporating the social value—the "utility"—of the offending activity into the litany of circumstances to be weighed in determining whether a particular use of property was "unreasonable." Thus, the utility of an offending activity militated not merely against the issuance of an injunction, but also against a determination that the offending activity was a nuisance at all. This second line of response found expression in the general ("black letter") principles set forth by the RESTATEMENT OF TORTS (1932) (herein cited as the First Restatement). Section 826 of the First Restatement declared that an invasion of another's enjoyment of property would be deemed unreasonable, and therefore a nuisance, *unless* the utility of the actor's conduct outweighed the gravity of the harm.

The Idaho Supreme Court never explicitly adopted the First Restatement. However, in *McNichols v. J.R. Simplot Co., supra*, the Court may have intimated a similar approach. In that case, emissions from a large phosphate plant were alleged to have adversely affected a small neighboring business. Both damages and injunctive relief were sought. As noted earlier in this opinion, the Supreme Court in *McNichols* found certain jury instructions to be incomplete; and the Court reversed a judgment for the phosphate plant. However, the Court also mentioned, without disapproval, other instructions stating that existence of a nuisance should be determined in light of "all circumstances," and outlining the factors to be weighed. These factors included "inconsequentialness of the relative size of importance of the respective businesses (relative benefit or loss is a pertinent factor). . . ." 74 Idaho at 324, 262 P.2d at 1014. This ambiguous language later was deemed to support a pattern jury instruction stating that "the interests of the community as a whole" should be considered in determining whether a nuisance exists. *See* Idaho Jury Instructions (IDJI) 491 (1st ed. 1974 & 2d ed. 1982).

Thus, when confronted with a choice between the two American lines of response to the problem of injunctions in nuisance cases, Idaho appeared to choose both. *Koseris* adopted the "comparative injury" doctrine, restricting the cases qualifying for injunctions without narrowing the scope of nuisance cases in which an aggrieved party was entitled to be compensated in damages. However, *McNichols* and IDJI 491 allowed the offending activity's value to the community to be considered in determining whether any nuisance existed at all.

Idaho's uncertain direction reflected a national confusion which led Dean Prosser to deliver his characterization of nuisance law as a "jungle." Indeed, Dean Prosser's treatise on torts, in its 1964 edition, reflected the ambivalence of the time. Prosser expounded the black letter test of the First Restatement, balancing the gravity of harm against the utility of the offending activity, for determining existence of a nuisance. However, he further noted that "[i]n an action for damages, the relative hardship upon the plaintiff and the defendant is not material, once the nuisance is found to exist." W. PROSSER, HANDBOOK OF THE LAW OF TORTS 621 (3d ed. 1964). In the 1971 edition of his treatise, Prosser further observed that in a case where the balancing test would preclude an injunction, nevertheless, "the defendant's conduct may be found to be so unreasonable that he should pay for the harm...." W. PROSSER, HANDBOOK OF THE LAW OF TORTS 604 (4th ed. 1971).

Dissatisfaction with the First Restatement also was expressed by the courts. In *Boomer v. Atlantic Cement Co.*, 26 N.Y.2d 219, 309 N.Y.S.2d 312, 257 N.E.2d 870 (1970), the New York Court of Appeals held that parties adversely affected by dust from a cement plant would be entitled to recover damages for the harm, although the value of the cement plant to the community was so great that its operation would not be enjoined. The Oregon Supreme Court also refused to follow the First Restatement's test for determining existence of a nuisance. In *Furrer v. Talent Irr. Dist.*, 258 Or. 494, 466 P.2d 605 (1970), the Court rejected the contention:

that in every case the jury has the power to exonerate the defendant from liability because it feels that the social value of the defendant's conduct outweighs the harm which the defendant has visited upon the plaintiff. * * * [I]f the plaintiff's land is harmed by the conduct of the defendant, the latter cannot escape compensating the plaintiff for the harm simply by showing that the defendant's use had a greater social value than the plaintiff's. [466 P.2d at 613.]

Similarly, *Jost v. Dairyland Power Coop.*, 45 Wis.2d 164, 172 N.W.2d 647 (1970), upheld compensation for crop damage caused by sulfur fumes from an electrical power generating plant. On appeal, the power company contended that the trial court erred by not allowing it to prove its economic importance to the region, as a defense against the damage claim. The Wisconsin Supreme Court replied:

We ... conclude that the court properly excluded all evidence that tended to show the utility of the [power company's] enterprise. Whether its economic or social importance dwarfed the claim of a small farmer is of no consequence in this lawsuit. It will not be said that, because a great and socially useful enterprise will be liable in damages, an injury small by comparison should go unredressed. We know of no acceptable rule of jurisprudence that permits those who are engaged in important and desirable enterprises to injure with impunity those who are engaged in enterprises of lesser economic significance. [172 N.W.2d at 653.]

Thus, it was clear by 1970 that the First Restatement's black letter test for existence of a nuisance had ceased to be—if, indeed, it ever was—an adequate expression of case law. The days were drawing to a close when an economic activity could escape all liability under nuisance law for harm caused to its neighbors, simply because a large measure of social utility was ascribed to it.

### III

The seeds of reform had been sown. They took root in fertile soil when the American Law Institute (ALI), which had begun to write a new restatement of the law of torts, turned its attention to the subject of nuisances in 1970.

#### A. *The ALI Proceedings*

The first pertinent draft of the new restatement, Tentative Draft No. 16, echoed § 826 of the First Restatement. It reiterated the test of balancing utility against gravity of the harm. However, in a memorandum to ALI participants, Professor Fleming James, Jr., argued that this test was no longer sufficient. At the 1970 Proceedings of the American Law Institute (herein cited as the 1970 Proceedings), Professor Robert Keeton moved that the Tentative Draft be amended so that "in the black letter of one of the appropriate sections this proposition be stated:

> '[E]ven though one's conduct is reasonable in the sense that its social utility outweighs the harms and risks it causes, he is subject to liability for a private nuisance if the resulting interference with another's use and enjoyment of land is greater than it is reasonable to require the other to bear under the circumstances without compensation.' " [1970 Proceedings at 312.]

Dean Prosser, who was then serving as the reporter of the Proceedings, acknowledged that the cases had come to disagree with the First Restatement's test for existence of a nuisance:

> [T]he cases—a great many of them—hold that no matter how reasonable the defendant's conduct is, no matter how socially useful it is, nevertheless, if it inflicts harm which from the plaintiff's point of view is unreasonable—it is unreasonable to expect him to bear that without compensation—there will be compensation, although there is no injunction. [1970 Proceedings at 311.]

Nevertheless, Prosser opposed Keeton's motion to amend the black letter of the Tentative Draft. Prosser argued that in determining whether an interference is greater than it is reasonable to expect the other to bear under the circumstances without compensation, the courts should continue to examine all circumstances including the utility of the offending activity. 1970 Proceedings at 323–24. Thus, Prosser would have retained, in substance, the First Restatement's black letter test for balancing utility against harm in determining existence of a nuisance. He would have relegated the question of damages to comments supporting the black letter.

However, several other participants, including Professor James, supported Keeton's motion. They urged a fundamental principle that, regardless of the balance between utility and harm, there should be liability in damages if a plaintiff's injury is more than he should bear without compensation. Professor Keeton, again taking the floor, emphasized that an ordinary reader, looking at the black letter of § 826, would be led to think that an invasion is deemed reasonable, and therefore gives rise to no liability for nuisance, if the utility exceeds the harm. Keeton urged that this was an erroneous conclusion, and that the black letter should be amended. Ultimately, Keeton's motion was put to vote, and the presiding officer declared that it had "plainly carried." 1970 Proceedings at 325.

This amendment of Tentative Draft No. 16 in 1970 led to preparation of Tentative Draft No. 17 in 1971. Dean John W. Wade succeeded Dean Prosser as reporter of the Proceedings and wrote the new draft. Wade viewed Keeton's 1970 motion as "having two ideas in it.

> (1) [T]hat the activity may be a very useful one in general so that it should not be abated and yet be one which should 'pay its own way' (i.e., compensate for the damage it caused), and (2) that the damage to the injured party may be so substantial that payment should be made regardless of the utility of the conduct."

Wade, *Environmental Protection, The Common Law of Nuisance and The Restatement of Torts,* 8 FORUM 165, 170 (1972).

Wade cautiously incorporated these ideas into Tentative Draft No. 17. In response to the first idea, he retained the balancing test between gravity of the harm and utility of the conduct but added a new factor for determining the gravity of the harm—"[w]hether it is impractical to maintain the activity if it is required to bear the cost of compensating for the invasion." As to the second idea, Wade did not change the black letter of the new restatement, but added pertinent comments. 1971 Proceedings of the American Law Institute (herein cited as 1971 Proceedings) at 74.

Wade's cautious method of dealing with Keeton's motion was criticized in the 1971 Proceedings. Professor Keeton noted that Tentative Draft No. 17 still contained a conflict between the black letter of § 826, which recited that an invasion would be deemed reasonable if the utility exceeded the harm, and those other sections or comments which said there could be liability for damages in some circumstances even though the utility exceeded the harm. Keeton urged that the black letter of § 826 itself be amended to set forth an additional, alternative test of nuisance—that despite its utility, an activity would be liable in damages if the harm it created were greater than others should be required to bear without compensation. 1971 Proceedings at 83. Reporter Wade then offered a proposal to that general effect. 1971 Proceedings at 85.

The only significant resistance to this proposal came not from any speakers who would have returned to the simple balancing test set forth in the First Restatement, but from those who felt the proposal did not go far enough in protecting against harm caused by activities with great social utility. It was suggested that allowing the utility factor to be considered—even on a question of injunctions, although not of damages—would in effect sanction a system of private eminent domain for large enterprises. 1971 Proceedings at 86. Professor Keeton acknowledged this potential problem, but urged that it be reserved for future consideration. He argued that it

was more important in 1971 for the ALI to state the basic principle that an economic activity could be held liable in damages for those whom it harms even if the utility of the conduct exceeded the gravity of the harm. 1971 Proceedings at 87.

Professor Dennis Hynes also emphasized the importance of changing § 826. He argued that liability in damages must not turn narrowly upon the balance of utility against harm. Rather, damages serve the important function of forcing an enterprise to bear the societal costs ("externalities") which its activity imposes upon neighboring land uses. 1971 Proceedings at 76–79. Such externalities, when not internalized by a mechanism such as damage awards, understate the cost of economic activity, creating an involuntary subsidy of the enterprise.

Dean Wade's proposal was not further amended during the 1971 Proceedings. It spawned Tentative Draft No. 18, prepared by Wade in 1972. This draft contained both the traditional balancing test and an alternative test—explained in greater detail below—for determining liability in damages. The concept of utility itself was also modified to indicate that the utility of an activity would be diminished if it did not pay its way in society.

## B. The Second Restatement

Ultimately, the provisions of Tentative Draft No. 18 were approved and incorporated into the private nuisance sections of chapter 40, RESTATEMENT (SECOND) OF TORTS (1977) (herein cited as the Second Restatement). The Second Restatement, like its predecessor, divides such nuisances into two groups: (a) "intentional and unreasonable" invasions of another's interest in the use and enjoyment of property, and (b) invasions which are "unintentional" but otherwise actionable under general tort principles. Second Restatement at § 822.

The first category is broader than the term "intentional" at first glance might suggest. Section 825 of the Second Re-

statement explains that an invasion is "intentional" if the actor knows that the invasion is resulting, or is substantially certain to result, from his activity. Thus, the purpose of an activity, such as a feedlot, may not be to invade its neighbors' interests in the use and enjoyment of their property; but the invasion is "intentional" within the meaning of the Second Restatement if the proprietors of the activity know that such an invasion is resulting—or is substantially certain to result—from the intended operation of their business. We focus upon "intentional" invasion, in this sense, because it is the type of nuisance alleged to exist in the present case.

The Second Restatement treats such an "intentional" invasion as a nuisance if it is "unreasonable." Section 826 of the Second Restatement now provides two sets of criteria for determining whether this type of nuisance exists:

> An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if
>
> (a) the gravity of the harm outweighs the utility of the actor's conduct, or
>
> (b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible.

The present version of § 826, unlike its counterpart in the First Restatement, recognizes that liability for damages caused by a nuisance may exist regardless of whether the utility of the offending activity exceeds the gravity of the harm it has created. This fundamental proposition now permeates the entire Second Restatement. The commentary to § 822, which distinguishes between "intentional" and "unintentional" invasions, and which serves as the gateway for all succeeding sections, emphasizes that the test for existence of a nuisance no longer depends solely upon the balance between the gravity of harm and utility of the conduct. Comment d to § 822 states that, for the purpose of determining liability for damages, an invasion may be regarded as unreasonable even though the utility of the conduct is great and the amount of harm is relatively small. Comment g to the same section reemphasizes that damages are appropriate where the harm from the invasion is greater than a party should be required to bear, "at least without compensation."

The distinction between damages and injunctive relief is carried over in the commentary to § 826. Comment e recognizes that the utility of an activity may be greatly reduced if it does not compensate those whom it harms. Comment f stresses that an intentional invasion, for which damages may be sought, is unreasonable where the harm can be compensated even if the gravity of the harm does not outweigh the utility of the conduct.

## C. Evaluation of The Second Restatement

The Second Restatement clearly has rejected the notion that if an activity's utility exceeds the harm it creates, the activity is not a nuisance and therefore is free from all liability in damages or for injunctive relief. See Pendergrast v. Aiken, 293 N.C. 201, 236 S.E.2d 787 (1977) (adopting Tentative Draft 18 of the Second Restatement). It discards those earlier authorities which had responded to the problem of disparate economic consequences of injunctions by narrowing the concept of nuisance. Thus, the Second Restatement today is inconsistent with the Idaho Supreme Court's decision in McNichols, supra, insofar as that decision is said to support IDJI 491. As noted earlier, this pattern instruction would require a jury to consider "the interest of the community as a whole" in determining whether a nuisance exists. IDJI 491 enunciates a single test for existence of a nuisance—regardless of whether damages or an injunction are sought—and obliquely incorporates the utility of the offending activity into the unified test. The pattern instruction perpetuates a discredited line of authority rejected by the Second Restatement.

In contrast, the Idaho Supreme Court's decision in Koseris, supra, is entirely consistent with—and in some respects might be

said to have presaged—the Second Restatement. In that case, a plaintiff sought injunctive relief, but claimed no damages, from fumes emitted by the same phosphate plant involved in *McNichols*. The phosphate plant offered to prove, among other things, that its facility was important to the economies and tax bases of certain counties in southeastern Idaho. The trial court disallowed the proof. On appeal our Supreme Court said:

> We are constrained to hold that the trial court erred in sustaining objections to those offers of proof, since they were relevant as bearing upon the issue whether respondents, in seeking *injunctive relief,* were pursuing the proper remedy; nevertheless, on the theory of *damages* which respondents had waived, the ruling was correct. [82 Idaho at 270, 352 P.2d at 239. Emphasis added.]

Both the Second Restatement and *Koseris* recognize that utility of the activity alleged to be a nuisance is a proper factor to consider in the context of injunctive relief; but that damages may be awarded regardless of utility. Evidence of utility does not constitute a defense against recovery of damages where the harm is serious and compensation is feasible. Were the law otherwise, a large enterprise, important to the local economy, would have a lesser duty to compensate its neighbors for invasion of their rights than would a smaller business deemed less essential to the community. In our view, this is not, and should not be, the law in Idaho.

*Koseris* and the Second Restatement also share a recognition of the fundamental difference between making an activity compensate those whom it harms, and forcing the activity to discontinue or to modify its operations. The damage question goes to a person's basic right in tort law to recover for harm inflicted by another. The injunction question is broader; it brings into play the interest of other persons who may benefit from the activity. Comparative benefits and hardships must be weighed in determining whether injunctive relief is appropriate. Thus, the Second Restatement is consistent with the "comparative injury" standard adopted in *Koseris*. *See also Hansen v. Indep. School Dist. No. 1,* 61 Idaho 109, 98 P.2d 959 (1939).

We believe that *Koseris* and the Second Restatement furnish better guidance than IDJI 491 for the future path of nuisance law in Idaho. The law of nuisance profoundly affects the quality of life enjoyed by all Idahoans. It should be broad in coverage, as our statutes provide, and fair in its application. It should not contain blind spots for large or important enterprises.

However, our view is not based simply upon general notions of fairness; it is also grounded in economics. The Second Restatement deals effectively with the problem of "externalities" identified in the ALI proceedings. Where an enterprise externalizes some burdens upon its neighbors, without compensation, our market system does not reflect the true cost of products or services provided by that enterprise. Externalities distort the price signals essential to the proper functioning of the market.

This problem affects two fundamental objectives of the economic system. The first objective, commonly called "efficiency" in economic theory, is to promote the greatest aggregate surplus of benefits over the costs of economic activity. The second objective, usually termed "equity" or "distributive justice," is to allocate these benefits and costs in accordance with prevailing societal values. The market system best serves the goal of efficiency when prices reflect true costs; and the goal of distributive justice is best achieved when benefits are explicitly identified to the correlative costs.

Although the problem of externalities affects both goals of efficiency and distributive justice, these objectives are conceptually different and may imply different solutions to a given problem. In theory, if there were no societal goal other than efficiency, and if there were no impediments to exchanges of property or property rights, individuals pursuing their economic self-interests might reach the most efficient allo-

cation of costs and benefits by means of exchange, without direction by the courts. *See* Coase, *The Problem of Social Cost*, 3 J.L. & ECON. 1 (1960). However, the real world is not free from impediments to exchanges, and our economic system operates within the constraints of a society which is also concerned with distributive justice. Thus, the courts often are the battlegrounds upon which campaigns for efficiency and distributive justice are waged.

Our historical survey of nuisance law, in Part II of this opinion, has reflected the differing emphases upon efficiency and distributive justice. As noted, the English system of property law placed a preeminent value upon property rights. It was thus primarily concerned with distributive justice in accord with those rights. For that reason the English system favored the injunction as a remedy for a nuisance, regardless of disparate economic consequences. However, when the concept of nuisance was incorporated into American law, it encountered a different value system. Respect for property rights came to be tempered by the tort-related concept of fault, and the demands of a developing nation placed greater emphasis upon the economic objective of efficiency relative to the objective of distributive justice. The injunction fell into disfavor. The reaction against the injunction, as embodied in the First Restatement, so narrowed the concept of nuisance itself that it rendered the courts impotent to deal with externalities generated by enterprises of great utility. This reaction was excessive; neither efficiency nor distributive justice has been well served.

In order to address the problem of externalities, the remedies of damages and injunctive relief must be carefully chosen to accommodate the often competing goals of efficiency and distributive justice. *See generally* Polinsky, *Resolving Nuisance Disputes: The Simple Economics of Injunctive and Damage Remedies*, 32 STAN.L.REV. 1075 (1980); Ellickson, *Alternatives to Zoning: Covenants, Nuisance Rules, and Fines as Land Use Controls*, 40 U.CHI.L.REV. 681 (1973). *Koseris* and the Second Restatement recognize the complementary func-

tions of injunctions and damages. Section 826(a) of the Second Restatement allows both injunctions and damages to be employed where the harm created by an economic activity exceeds its utility. Section 826(b) allows the more limited remedy of damages alone to be employed where it would not be appropriate to enjoin the activity but the activity is imposing harm upon its neighbors so substantial that they cannot reasonably be expected to bear it without compensation.

■ We follow *Koseris* and adopt § 826 of the Second Restatement. To the extent that IDJI 491 is inconsistent with our decision today, we urge that it be modified. In any event, IDJI 491 is merely recommendatory in nature; it is not mandatory. I.R. C.P. 51(a)(2).

D. *Implications of the Second Restatement*

Each of the parties in the present case has viewed the Second Restatement with some apprehension. We now turn to those concerns.

The homeowners, echoing an argument made during the ALI proceedings, have contended that the test of nuisance set forth in § 826 grants large enterprises a form of private eminent domain. They evidently fear that if the utility of a large enterprise exceeds the gravity of the harm it creates—insulating it from an injunction and subjecting it to liability only in damages—the enterprise might interfere at will with the enjoyment and use of neighboring property, upon penalty only of paying compensation from time to time. Such a result might be consistent with the economic goal of efficiency, but it may conflict with the goal of distributive justice insofar as it violates a basic societal value which opposes forced exchanges of property rights. *See* Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts*, 70 YALE L.J. 499, 536 (1961).

Even those legal scholars who advocate the most limited role for injunctions as a remedy against nuisances acknowledge that

damages may be inadequate, and injunctions may be necessary, where the harm in question relates to personal health and safety, or to one's fundamental freedom of action within the boundaries of his own property. Ellickson, *supra,* 40 U.CHI.L.REV. at 740–41. Ordinarily, plaintiffs in such cases would prevail on the test which balances utility against gravity of the harm. Moreover, in the exceptional cases, the offending activity might be modified or eliminated through legislative or administrative controls such as environmental protection laws or zoning. Therefore, we expect that few cases would remain in need of a judicial remedy. However, we do not today close the door on the possibility that an injunction might lie, to protect personal health and safety or fundamental freedoms, in cases missed by the balancing test and by non-judicial controls. To this extent, our adoption of the Second Restatement's test of nuisance stops short of being absolute.

The Second Restatement also has encountered a host of objections from the feedlot proprietors and from the amicus curiae. These objections reflect genuine, legitimate concerns of Idaho business, particularly the agricultural community. The concerns have been eloquently presented by able counsel. We recognize that business is an anchor of our state. We believe that Idaho business will find that it can operate responsibly and profitably within the contours of nuisance liability defined by the Second Restatement. Every business person is someone else's neighbor. Business people are as much benefited by protecting our quality of life as are other Idaho residents. We further note that business enterprises which do not depend for their viability upon an asserted right to impose serious harm upon their neighbors will not be threatened by the nuisance tests articulated in the Second Restatement.

Beyond these general observations, we address several particular objections to the Second Restatement. First, our attention has been invited to the Idaho "Right to Farm Act," I.C. §§ 22–4501 *et seq.* This

Act recites the Legislature's concern that agricultural activities conducted on farmland in urbanizing areas often are subjected to nuisance lawsuits. The Act imposes restrictions upon such lawsuits. However, we find that these restrictions are inapposite to the present case. The Act does not apply to lawsuits commenced before March 31, 1981. *See* I.C. § 22–4504. The homeowners' complaint in the instant case was filed on March 28, 1978.

■ More fundamentally, even assuming, without deciding, that a feedlot constitutes an "agricultural operation" within the meaning of the Act, the Act precludes a finding of nuisance only with respect to an activity which would not have been a nuisance but for a change in surrounding non-agricultural uses more than one year after the activity began. *See* I.C. § 22–4503. In contrast, the pleadings in the present case disclose that the feedlot is alleged to be a nuisance, not because of changes in surrounding non-agricultural uses, but because of an expansion of the feedlot itself.

The proprietors and amicus curiae recognize that the Act does not strictly apply in this case, but they suggest that it is a legislative statement of policy which should inhibit our adoption of the Second Restatement. However, the Act in essence represents a statutory adaptation of the common law doctrine of "coming to the nuisance." This doctrine does not conflict with the Second Restatement.

At early common law, the doctrine of "coming to the nuisance" was thus expressed:

> If my neighbor makes a tan-yard so as to annoy and render less salubrious the air of my house or gardens, the law will furnish me with a remedy; but if he is first in possession of the air, and I fix my habitation near him, the nuisance is of my own seeking, and may continue.

2 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND, 402 (17th ed. 1830). This rigid doctrine later was changed to provide that coming to the nui-

sance was not an absolute bar to the finding of a nuisance, but was merely one factor to be considered. *E.g., Kellogg v. Village of Viola,* 67 Wis.2d 345, 227 N.W.2d 55 (1975); *Spencer Creek Pollution Control Ass'n v. Organic Fertilizer Co.,* 264 Or. 557, 505 P.2d 919 (1973). This change stemmed from recognition that an absolute bar to a finding of nuisance would, in effect, give the offending activity a perpetual servitude upon the land of its neighbors without the payment of any compensation.

In keeping with this case law development, the Second Restatement recites, at § 840D, that coming to the nuisance is not a total bar to relief, but is a factor to be considered. When this section of the Second Restatement is considered in relation to the tests of nuisance set forth in § 826, we believe that coming to the nuisance is a factor which a jury may consider in evaluating the seriousness of the harm later claimed by the plaintiffs. We conclude that the Act affords no basis to view the Second Restatement as contrary to legislative policy.

The feedlot proprietors and amicus curiae also contend that the Second Restatement should be rejected because it assertedly contains a rule of absolute liability, making an enterprise liable in damages to anyone adversely affected by its operations. However, this argument overlooks the requirement in § 826(b) that the harm be "serious." A plaintiff who fails to demonstrate harm exceeding the utility of a defendant's conduct will fail to establish a nuisance under § 826(a). The plaintiff also will fail under § 826(b) unless the trier of fact is persuaded that the harm shown is "serious." Long before the Second Restatement, it had been well established by case law that an activity would not be deemed a nuisance unless the harm attributed to it was more injurious to the normal use and enjoyment of land than the harm attributed to other types of activities customarily encountered in the relevant area. *E.g., Amphitheaters, Inc. v. Portland Meadows,* 184 Or. 336, 198 P.2d 847 (1948); *The Shelburne, Inc. v. Crossan Corp.,* 95 N.J.Eq. 188, 122 A. 749

(1923). Moreover, "[a]n interference is not a nuisance unless, among other things, it *substantially* interferes with the use and enjoyment of neighboring land." Rabin, *Nuisance Law: Rethinking Fundamental Assumptions,* 63 VA.L.REV. 1299, 1319 (1977) (emphasis in original). In our view, unless the harm claimed by a plaintiff is substantial, and more injurious than that caused by other types of activities customary to the area, it would not be deemed "serious" within the meaning of § 826(b).

In determining seriousness, the factors for evaluating gravity of harm, as set forth in § 827, may be utilized. They include the extent and character of the harm, the suitability of the particular use or enjoyment invaded to the character of the locality, the burden on the injured person to avoid such harm, and the value which the law attaches to the type of use or enjoyment invaded. The last factor—the value attached to the type of use or enjoyment invaded—obviously relates to its intrinsic value when applied under § 826(b); its relative value, in comparison with the utility of the offending activity, should be considered only when applying § 826(a).

Moreover, comment g to § 822 makes it clear that the Second Restatement does not create a rule of absolute liability. The comment states, in part, the following:

> Not every intentional and significant invasion of a person's interest in the use and enjoyment of land is actionable. . . . Life in organized society and especially in populous communities involves an unavoidable clash of individual interests. Practically all human activities unless carried on in a wilderness interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms. . . . Liability for damages is imposed in those cases in which the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation.

The feedlot proprietors and amicus curiae also assert that the Second Restatement

will prove uneven in its application, because damages may be awarded only in those cases where the payment of such compensation is "feasible." They contend that the element of feasibility subjects a profitable enterprise to greater potential liability than that which would attend a similar activity conducted by a marginal business. However, we believe this contention misperceives the thrust of the feasibility requirement.

As used in § 826(b), the term "feasible" does not refer to the financial condition of the business conducting the activity, but refers to the activity itself. Section 826(b) merely recognizes that if the burden of paying compensation in damages would make it unfeasible to continue the activity, the effect of a damage award would be to discontinue operation of the activity. In those circumstances, the result would be the same as an injunction. In order to qualify for injunctive relief under § 826(a), a plaintiff would be required to show that the gravity of the harm exceeded the utility of the defendant's conduct. Thus, as noted in comment f to § 826, "[i]f imposition of this financial burden would make continuation of the activity not feasible, the weighing process for determining unreasonableness is similar to that in a suit for injunction." Comment f to the same section further notes that the feasibility requirement may limit the scope of plaintiffs who can recover:

> [I]n the case of a factory emitting smoke and odors, the granting of compensation for annoyance and inconvenience to all persons located in the general vicinity may create a burden so heavy as to make it not feasible to continue to operate the factory. Compensation may therefore be granted only to those in closer vicinity to the plant whose annoyance is more severe, and not to those farther away whose annoyance is less.... Cases involving airport noise [also] illustrate this principle.

The element of feasibility illustrates the interrelationship between § 826(a) and § 826(b). If a plaintiff suffers serious harm from an intentional invasion of the use and enjoyment of his property, he is entitled to injunctive relief or damages—or a mix of these remedies—if the trier of fact determines that the gravity of the harm exceeds the utility of the defendant's conduct. If the harm does not outweigh the utility, but remains serious, the plaintiff's remedy is limited to damages—subject, however, to the further limitation that if the nature of the activity (not the particular enterprise conducting it) is such that payment of compensation in damages would cause the activity to be discontinued, then the damage award will be viewed as having the same impact as an injunction. In those circumstances, full compensation will not be awarded unless the gravity of the harm has been found to exceed the utility of the defendant's conduct.

## IV

We now resume our focus upon the instant case. The feeding of large congregations of animals within the confined area of a feedlot may create problems that affect the use and enjoyment of neighboring properties. *See generally* Recker, *Animal Feeding Factories and the Environment: A Summary of Feedlot Pollution, Federal Controls, and Oklahoma Law,* 30 SW.L.J. 556 (1976). In general, feedlots are subject to the same principles of nuisance law which apply to other economic activities. *Botsch v. Leigh Land Co.,* 195 Neb. 509, 239 N.W.2d 481 (1976). General nuisance instructions were given to the jury in this case.

The actual instructions need not be set forth at length. In summary, the district court instructed the jury on the concept of an "intentional" invasion, within the meaning discussed earlier in this opinion. The court then informed the jury that a nuisance characterized by such an invasion could be found to exist only if the invasion were found to be unreasonable, and that "gravity of any harm" and "utility of defendants' conduct" should be weighed as factors in determining unreasonableness. The court also instructed the jury to take

into account such factors as "the interests of the community as a whole," the "general public good," and the "social value" of the defendants' conduct. In short, the district judge gave the jury a set of instructions which did not conform precisely to, but were consistent with, the First Restatement and IDJI 491. The court took no account of *Koseris,* nor of the dual criteria for determining the existence of a nuisance under § 826 of the Second Restatement. The jury was given no instruction on damage liability comparable to § 826(b) of the Second Restatement. We conclude that the jury was improperly instructed, in light of our adoption today of the Second Restatement's criteria for determining existence of a nuisance.

The feedlot proprietors argue that even if the instructions failed adequately to state the entire standard contained in the Second Restatement, nevertheless, the instructions sufficiently stated the test of balancing harm against utility under § 826(a). Accordingly, the proprietors urge us not to disturb that part of the district court's judgment which denied injunctive relief. They contend that any remand in this case should be limited to a determination of damage liability—that is, whether the harm claimed by the plaintiff was "serious" and the payment of compensation was "feasible" under § 826(b). This argument is attractive because it comports with a surface reading of the tests set forth in the two subsections of § 826. However, we believe the argument overlooks the deeper interrelationships between these subsections, and between the remedies of damages and injunctive relief.

As noted earlier, the questions of existence of a nuisance and of liability for damages under § 826(b) turn, in part, upon the feasibility of compensation. If the nature of the activity itself is found to be such that payment of compensation would not be feasible, then the trier of fact could not find a nuisance to exist, and could not make a damage award, unless the gravity of the plaintiffs' harm were determined to exceed

the utility of the defendants' conduct under § 826(a). This clearly would overlap with the issue framed in the first trial.

▆ No two trials in the same action are identical. A second trial in this case might involve more or less evidence, or different emphases upon the evidence, than the first trial. We believe it would be unsound to preclude the trier of fact in a second trial from reaching an issue governed by § 826(a) if that issue were central to the outcome of the case under § 826(b). A remand for full consideration of both subsections would not contravene the general rule that an issue actually litigated and determined by final judgment in one action will not be retried in another action. This rule of issue preclusion, by its own terms, applies only where a judgment is final and the same issue is again raised in a subsequent action. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1980). Here the judgment below is not final if we vacate it; and any new trial upon remand would be in the same, not a subsequent, action.

▆ Further, we believe that a rigid separation of § 826(a) from § 826(b) would be inconsistent with the nexus between the remedies of damages and injunctive relief in nuisance cases. A nuisance may be alleviated by no fewer than four possible remedies: (1) an injunction; (2) damages; (3) a conditional injunction, which may be dissolved or modified upon payment of damages; or (4) in unusual circumstances, the "purchased injunction" which is imposed upon condition that a plaintiff may make some offsetting payment to the defendant. Calabresi & Malamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral,* 85 HARV.L.REV. 1089 (1972). Moreover, where a nuisance can be abated, and the harm is not permanent but would stop when the nuisance is abated, a plaintiff would not necessarily be entitled to permanent damages. Rather, he could receive temporary or conditionally continuing damages, until the abatement occurs.

*E.g., Ryan v. City of Emmetsburg,* 232 Iowa 600, 4 N.W.2d 435 (1942). *Compare Shaw v. City of Rupert,* —— Idaho ——, —— P.2d —— (June 9, 1983) (holding that permanent damages may be awarded where recurring harm is probable).

Thus, in a nuisance case, the remedies may not be simplistically differentiated between damages and injunctive relief. Some mixture of the remedies may be appropriate. Because the two tests for existence of a nuisance under § 826 carry direct implications for the types of remedies available, the possible mixture of remedies makes it conceptually unsound for different triers of fact, upon different presentations of evidence, to determine the existence of a nuisance under §§ 826(a) and 826(b), separately.

We conclude that the entire judgment of the district court, entered upon the verdict of a jury which had been improperly instructed, must be vacated. The case must be remanded for a new trial to determine whether a nuisance exists under the full criteria set forth in § 826 of the Second Restatement.

■ Because a remand is necessary, we will also address an issue, raised by the homeowners, as to whether the district court should have instructed the jury that they could consider "standards and practices in the feedlot business." Because this case involves an alleged "intentional" invasion, it would have been inappropriate to give the jury any "standards and practices" instruction which suggested that negligence was an issue in the case. The concept of negligence has no application to "intentional" invasions under the Second Restatement. An issue of negligence may arise only in connection with "unintentional" invasions. *See* Second Restatement at § 822, comment i; *compare Preston v. Schrenk,* 77 Idaho 481, 295 P.2d 272 (1956). The district court safeguarded the instruction on this point by informing the jury that the plaintiffs were "not required to show negligence . . . in order to establish a nuisance."

■ However, there is a further limitation upon the use of a "standards and practices" instruction. In *Koseris,* the phosphate plant's offer to prove the utility of its operation had been coupled with a companion offer to prove its use of modern pollution control procedures. Our Supreme Court referred to both of these offers of proof when it said that the evidence could be allowed on a question of injunctive relief, but would have been improper on an issue of damages. Similarly, the Second Restatement refers to the skill or care with which an activity is conducted as a factor to be considered only in measuring the utility of the conduct. *See* § 828, comment h. Thus, it falls within the balancing test set forth in § 826(a), but would not apply to a determination of nuisance under § 826(b). We instruct upon remand that if the district court again elects to give a "standards and practices" instruction, it should inform the jury that such "standards and practices" are germane only to a determination under § 826(a) and are not to be considered among the criteria applied to a determination of nuisance under § 826(b).

The judgment of the district court is vacated. The case is remanded for further proceedings consistent with this opinion. Costs to appellants. No attorney fees on appeal.

WALTERS, C.J., and SWANSTROM, J., concur.